**EASTER HOUSE, an Illinois, not-for-profit corporation, Plaintiff–Appellee,**

**v.**

**Thomas FELDER, Florence McGuire and Joan Satoloe, Defendants–Appellants.**

No. 86–2164.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1987.

Reargued En Banc Feb. 9, 1989.

Decided July 11, 1989.

As Corrected Aug. 4, 1989.

Thomas A. Ioppolo, Office of the Atty. Gen., Chicago, Ill., for defendants-appellants.

James R. Figliulo, Foran, Wiss & Schultz, Carl A. Gigante, Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

A jury found that in two separate instances the appellants, employees of the Illinois Department of Children and Family Services, acted under color of state law to deprive Easter House, a Chicago-based adoption agency, of property without due process of law. The district court denied the appellants' post-trial motions for judgment notwithstanding the verdict or for a new trial. We reverse and hold that section 1983 is not available to Easter House in the first instance of alleged misconduct because adequate state law remedies provide all of the process which was due and that in the second instance Easter House cannot identify any property interest of which it was deprived under color of state law.

1. We largely adopt, with his consent, the facts set forth by Judge Cudahy in the original panel

## I. BACKGROUND [1]

Easter House is a Chicago-based adoption agency, owned and operated by Seymour Kurtz, and licensed by the Illinois Department of Children and Family Services ("DCFS"). This suit arises from a series of events involving (1) Easter House's application for renewal of its license, (2) its Executive Director's decision to depart while the application was pending and open a rival adoption agency with a similar name, (3) the appellants' decisions, as DCFS employees, to delay action upon Easter House's application for renewal of its license and to expedite action upon the former director's application to start a new agency, and (4) the appellants' decision to order various investigations of Easter House's operating procedures approximately two years later. According to Easter House, the appellants' actions were taken under color of state law and deprived Easter House of identifiable constitutionally-protected property interests in violation of 42 U.S.C. § 1983. As Easter House did below, we will treat its claims as involving two separate conspiracies and set forth the facts supporting each more fully below.

### A. The Licensing Conspiracy

Easter House alleged that the appellants conspired with Easter House's former Executive Director to deprive it of, among other things, its operating license. This conspiracy involved two separate and distinct prongs. First, the appellants allegedly acted improperly in delaying action upon Easter House's application for renewal of its license. Second, Easter House contended that the appellants improperly granted a license to Easter House's former Executive Director in an expeditious manner. Easter House claimed that together these two courses of action resulted in a property deprivation in violation of section 1983.

### 1. Easter House's Application for a Renewal License

Easter House's operating license was scheduled to expire on November 30, 1974.

opinion as reported at 852 F.2d 901, 904-09 (7th Cir.1988).

In late November, Easter House began preparing for renewal of that license. Joan Satoloe, a licensing representative assigned to the DCFS's Chicago office, prepared a relicensing study which recommended renewal of Easter House's license for the two-year period beginning December 1, 1974. This recommendation was forwarded to the DCFS's main office in Springfield, Illinois, where the final licensing decisions are made and the licenses ultimately are issued.

While Easter House's application was pending, its Executive Director, Millicent Smith, decided to leave, apparently on less than amicable terms. On December 30, 1974, while Satoloe was on vacation, Smith met with Satoloe's immediate supervisor, Florence McGuire, the licensing supervisor for the DCFS's central district, to tell her of her plans to leave Easter House and start a new adoption agency.[2]

At that meeting, Smith described the reasons for her growing disenchantment with Easter House.[3] She informed McGuire that she had been planning to leave Easter House for some time, but had delayed her action until Kurtz, Easter House's owner, had left on a year-end vacation. Apparently, his absence would facilitate her ability to start a rival adoption agency called the Easter House Adoption Agency, Inc.

("Easter House II").[4] She told McGuire that she had decided to use a name closely resembling Easter House and to take Easter House's files[5] to ensure that her leaving would not deprive her of the rewards to which she felt entitled based upon her long tenure at Easter House.

After the meeting, McGuire called the DCFS's Springfield office to request a delay in the mailing of Easter House's renewed license. On the following day, December 31, 1974, Smith wrote to Satoloe and Thomas Felder, the chief of the DCFS for the central district, and described the prior day's meeting as well as stressed the importance of rapid action upon Easter House II's charter application. In a letter to McGuire, Smith also indicated that Fran Riley, Easter House's only other trained social worker, had decided to leave Easter House and join Easter House II. Smith also thanked McGuire for withholding Easter House's license. On that same day, Smith wrote to Kurtz resigning her position at Easter House.

After discussing Easter House's situation with McGuire, Felder agreed with McGuire that Easter House's renewed license should remain on hold at the Springfield office. On January 6, 1975, Felder wrote to Kurtz, informing him that the departures of Smith and Riley, Easter

---

2. According to Smith's testimony at trial, she had met with McGuire at least once prior to December 30, 1974, to discuss with McGuire her plans to leave Easter House. However, McGuire and the other appellants disputed Smith's testimony, arguing that the DCFS had no knowledge of Smith's plans prior to the December 30th meeting.

3. The subjects discussed at the December 30, 1974, meeting are evidenced by a memorandum prepared by McGuire and sent to licensing representative Satoloe later that same day. The memorandum indicates that Smith detailed her past actions and future plans in the adoption business quite extensively.

 For example, Smith purportedly stated that she had decided to leave Easter House because Seymour Kurtz, Easter House's owner-president, had altered his long-standing practice of delegating day-to-day management to Smith and had started to play a more active role. Smith also told McGuire that Easter House had brought several new people into the operation who answered to Kurtz rather than to her. She

indicated that she was frustrated by her inability to halt practices of the new employees which she found objectionable, including careless handling of confidential adoption records and telephone solicitation of affluent former clients to increase the number of placements. Finally, Smith made vague allegations that Easter House was connected to foreign adoption agencies through which Kurtz had told Smith he expected "to make a million."

4. She told McGuire that her sister, Pacita Haire, already had signed the charter application for a new agency, which Smith planned to own and operate. Smith apparently did not apply under her own name to avoid detection by Kurtz of her plan.

5. Smith told McGuire that she had removed all of Easter House's active case files and also indicated that she likewise planned to remove the closed files before Kurtz's return. All of the files were to be transferred to Easter House II which would allow the new agency to hit the ground running.

House's only trained social workers, had put the agency out of compliance with the DCFS's licensing standards. *See* DCFS Regulation 5.10 (1970) (requiring child welfare agencies to have at least one employee with a Master of Social Work degree and two years of supervisory experience in social work). He also stated that if Easter House wished to resume operations it would have to reattain minimum standards and reapply for a license.[6]

Two days after sending the first letter, Felder, upon the advice of a DCFS attorney, wrote a second letter to Kurtz. Felder informed Kurtz that the January 6th letter had been incorrect and that, pursuant to the Illinois Child Care Act of 1969, Easter House would have ten days from receipt of the second letter to request a hearing before the DCFS's refusal to issue a renewed license would become final. However, the second letter did not offer to provide the assistance required by the DCFS's regulations and enforcement manual. *See supra* note 6.

During the period between the decision to withhold renewal and Kurtz's response, the DCFS received two inquiries about the status of Easter House, one from a lawyer representing prospective clients and one from a social worker interested in applying for the position which Smith previously had held. Both callers were told that Easter House had no license. The DCFS further informed the prospective job applicant that the DCFS was in the process of reviewing

Easter House's "entire program." Also during this period, Felder wrote to Judge Comerford, then the Chief Judge dealing with adoptions in Cook County, and notified him that Easter House was no longer licensed to make adoption placements.

Kurtz received both of Felder's letters on January 12, 1975. On January 22, Kurtz wrote to the DCFS, requesting a hearing and a written statement of charges. On February 4, two weeks after he had hired a new Executive Director, Kurtz met with Felder to discuss information which Kurtz had obtained about Smith's new operation and the relicensing of Easter House. At that meeting, Kurtz waived the hearing which had been offered in the January 8th letter after Felder assured him that the absence of proper staff was the only barrier to the issuance of Easter House's license. Soon thereafter, Satoloe visited Easter House and approved the new Executive Director's credentials. On February 19, 1975, Easter House received its renewed license to operate as a child welfare agency during the period from December 1, 1974, through November 30, 1975—in effect, never losing its legal authority to operate as an adoption agency.

### 2. Easter House II's Charter Application

The alleged conspiracy to deprive Easter House of its license had a second part. Easter House contended below that the DCFS's actions in granting Smith's license

---

**6.** At trial, Felder testified that he withheld renewal of Easter House's license under authority of section 8(1) of the Illinois Child Care Act of 1969, 1969 Ill.Laws 105 (current version as amended at Ill.Rev.Stat. ch. 23, ¶ 2218(1) (1988)). This provision authorized the DCFS to refuse to renew the license of an agency which "consistently fail[ed] to maintain the standards prescribed and published by the Department." However, Felder conceded during cross-examination that the suspension was inconsistent with the Illinois Child Act and with the DCFS's regulations and enforcement manual, which set forth various steps which the DCFS would take to bring a licensee into compliance with minimum standards before revoking or refusing to renew a license.

For example, section 7(c) of the Child Care Act, Ill.Rev.Stat. ch. 23, ¶ 2217(c) (1988), stated that the DCFS "shall offer consultation ... to assist applicants and licensees in meeting and maintaining minimum requirements." Section 5.02(II) of the Department's regulations state: "Reasonable efforts by the Department shall be made to assist a licensed child care facility to meet minimum standards. If, after such efforts, the facility fails to meet applicable standards, the license of such facility shall be revoked or not renewed." In addition, section 15 of the DCFS's enforcement manual also indicated that licenses should not be revoked or renewals withheld until state officials had met with the licensee to discuss inadequacies and provided ten to fourteen days for the correction of violations.

for Easter House II were so irregular as to evidence the DCFS's intent to aid Smith in destroying Easter House.

In Illinois, child welfare agencies, such as Easter House and Easter House II, must apply to the Illinois Department of State for a charter which operates essentially as a certificate of incorporation. However, unlike ordinary corporations, child welfare agencies are subjected to charter studies by the DCFS in addition to the usual processing by the Illinois Department of State. According to testimony at trial, charter studies for child welfare agencies are intended to ensure that new agencies would serve the public interest. An ordinary DCFS charter study seeks to determine, among other things, whether an agency will serve a public need and whether the people forming the agency are reputable.

In addition to the charter application, which both the Department of State and the DCFS review, a child welfare agency must submit an application for an initial license directly to the DCFS. The DCFS's investigation undertaken prior to issuing a charter and initial license does not differ significantly from the investigation performed in connection with license renewals. If the DCFS issues a license, either an initial license or a renewed license, it in effect certifies that the child welfare agen-cy conforms with the DCFS's minimum standards.

Easter House II submitted a charter application to the Illinois Department of State on December 17, 1974. The application was forwarded to the appellants at the DCFS's Chicago office on January 2, 1975. On January 6, 1975, Easter House II submitted its license application to the DCFS. On February 6, 1975, the DCFS's Chicago office forwarded to its Springfield office a recommendation that a charter license be issued to Easter House II.

At trial, Easter House produced evidence that the DCFS's approval of Easter House II's charter and license application had been extremely irregular. First, it showed that the appellants knew of conduct by Smith that, at a minimum, cast doubt upon her fitness. For example, from the appellant's direct interactions with Smith and from complaints lodged by Kurtz, they knew that (1) Smith had attempted (albeit unsuccessfully) to divert Easter House's mail and telephone calls to her new address, (2) she had insisted upon using the name confusingly similar to Easter House's despite warnings that the similarity could mislead the public,[7] (3) Smith had taken files from Easter House,[8] and (4) she attempted to place an adopted child with a couple, who believed they were still working with Easter House, before Easter

---

7. At trial, the appellants acknowledged that they had been concerned that the public would be confused by the similarity of the names for Smith and Kurtz's respective agencies. Furthermore, McGuire, Felder, and Smith all testified that they had attempted, without success, to dissuade Smith from using Easter House's name for this reason. However, Easter House II was approved by the Illinois Secretary of State as part of the chartering process and testimony showed that the DCFS's legal department believed that the DCFS lacked authority to block a charter or license based on this type of confusion.

The appellants' lack of active participation in a scheme to aid Smith in "stealing Easter House's business through theft of its name" is further evinced by the letter notifying Smith that her license had been approved. That letter indicated that the DCFS could not block her license on the basis of name confusion, but nonetheless warned Smith that use of Easter

House II could result in legal action by Easter House.

8. Smith's removal of Easter House's files represented a more serious matter, because Easter House was unable to manage its cases, or to arrange for some other agency to manage its cases pending renewal of its license, without the information these files contained. In her letters to Kurtz and her testimony at trial, Smith claimed she had taken the files to preserve the confidentiality of the records and not to take Easter House's business. However, a contrary inference could be drawn from Smith's representations to McGuire that, in the words of McGuire's summary, Smith intended to end her association with Kurtz in a way which would not "allow to go down the drain the eleven years of experience and hard work she had put into building up Easter House." At trial, Felder stated that the DCFS had believed Smith's professions of concern about confidentiality and took the position that the return of the records was a matter strictly between Kurtz and Smith.

House II was licensed.[9]

Easter House also produced evidence that the charter and license studies were not conducted in accordance with normal procedures. For example, the jury heard evidence that the appellants may have fabricated certain aspects of the charter investigation. Furthermore, the appellants allegedly prepared the license study several days after deciding to approve Smith's application. Although the license study is undated, its text refers to a March 17, 1975, letter from the head of the DCFS to the Secretary of State, indicating that it was completed forty-one days after the Chicago office's recommendation had been sent to Springfield.

### B. *The Conspiracy to Harass*

Easter House also alleged below that the appellants participated in a second distinct conspiracy, a conspiracy to harass Easter House in violation of 42 U.S.C. § 1983. This conspiracy concerned the DCFS's investigation of Easter House's operations during 1976 and 1977, investigations undertaken long after the 1974 renewal license was granted.

At trial, Easter House offered evidence to prove that Felder and McGuire conducted an intensive investigation of Easter House, beginning in late 1976 with McGuire's review of Easter House's subsequent application to renew its license. Later, in early 1977, the DCFS dispatched investigator Tom Howard to undertake a more thorough review.[10] At trial, Howard testified that upon three occasions he reported negative results to the appellants and offered his opinion that Easter House was operating legally. He further testified that upon each occasion the appellants instructed him to redouble his efforts to find evidence of wrongdoing.

## II. DISCUSSION

On appeal, the appellants raise a wide variety of issues. However, we need only consider those arguments which address the applicability of section 1983 to the alleged conspiratorial conduct described above. We must determine (1) "whether the conduct complained of was committed by a person acting under color of state law," (2) whether these actions deprived Easter House of constitutionally protected

9. On February 3, 1975, Kurtz told Felder that he had spoken with a couple who had applied to Easter House for an adoption prior to Smith's departure. The couple, who had thought they were still dealing with Easter House, had received the baby from Smith and given Smith a check for $3,000.00. When they attempted to contact Smith later at Easter House, they spoke with Kurtz instead. When Felder confronted Smith with Kurtz's information, she initially denied any knowledge of the matter, but called back fifteen minutes later to admit that she had made the placement. Because the placement was legally invalid, payment on the check was stopped and a court proceeding was arranged to legalize the adoption. The defendants appear not to have considered this episode as relevant to Smith's fitness to run an adoption agency. Three days after this illegal placement came to light, before the adoption had been legalized, the DCFS's Chicago office recommended to Springfield that Smith's charter and license be approved.

The appellants point out that Felder brought Smith's action to the attention of the State's Attorney. However, Felder's letter reporting the matter seems to downplay the incident. The letter described the unlawful placement vaguely as "an apparent violation of the Child Care Act"

and identifies the "primary informant" as Smith's former employer, suggesting that the allegation may be inaccurate. The letter also stressed that the adoption was subsequently legalized by the court and indicated that the DCFS nevertheless had decided to approve Smith's license. The letter does not mention that Smith apparently represented herself as an agent of Easter House to the adoptive parents and biological mother or that she initially denied the incident to Felder.

In addition to the letter's language, its timing also undercut its usefulness to the appellants. Felder sent the letter on March 20, 1975, more than six weeks after he first learned of the attempted placement, but only ten days after Felder and his superior and the DCFS's Springfield office received letters from an attorney inquiring upon Kurtz's behalf as to the DCFS's intended response to Smith's actions.

10. Howard conducted a "pretextual investigation" in which another investigator posed as a prospective parent. Howard also undertook a thorough review of Easter House's files with particular emphasis upon Easter House's dealings with Kurtz's foreign connections, apparently the foreign connections from which, according to Smith two years earlier, Kurtz planned "to make a million."

property interests, and (3) whether the alleged deprivation occurred without due process of law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). Only if Easter House satisfies its burden at each step of the inquiry may we conclude that it has a viable claim under section 1983. We again will discuss each conspiracy separately.

### A. *The Licensing Conspiracy*

The parties concede that the appellants' actions in processing the licensing applications submitted by Easter House and by Smith were taken under color of state law. However, the appellants dispute Easter House's ability to satisfy the remaining inquiries dictated by *Parratt*. Specifically, they do not believe that it can demonstrate that an actual deprivation of an identified property interest occurred. Moreover, even assuming that such a deprivation occurred, the appellants believe that Easter House received all of the due process protection which *Parratt* and its progeny contemplate.

### 1. Deprivation of a Property Interest

■ Whether Easter House can identify a property interest of which it was deprived is a difficult question.[11] Property, for purposes of the due process clause of the fourteenth amendment, is "a legitimate claim of entitlement." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A claim of entitlement is "defined by existing rules or understandings that stem from an independent source such as state law." *Id.* We believe that the statutory and regulatory limitations upon the DCFS's authority to deny license renewals to child welfare agencies created such a legitimate claim of entitlement. *See* 1969 Ill.Laws 104–105 (current version as amended at Ill.Rev.Stat. ch. 23, ¶¶ 2218–2219 (1988)); *see also generally Reed v. Village of Shorewood*, 704 F.2d 943, 948–49 (7th Cir.1983). Thus, Easter House had a property interest in the renewal of its license.

However, the issue remains whether Easter House ever suffered a deprivation of the identified property interest. Apparently, agencies with renewal applications pending do not need to have a current license in hand to operate. Furthermore, although Easter House's license expired November 31, 1974, Easter House never curtailed any aspect of its operations prior to Smith's departure at the end of December. More importantly, the DCFS never indicated that it considered Easter House's interim operation improper.[12]

Easter House argues that the January 6th letter from Felder to Easter House could be interpreted as an order that Easter House cease operations under section 9(b) which would constitute an actual deprivation of its license. That letter informed the Easter House that it would have "to make reapplication for license and to meet licensing standards for a child welfare agency" before it could operate again.

---

**11.** The jury instructions identified four forms of property which the jury could find the defendants to have taken from Easter House without due process of law:
(1) Its child welfare agency license; (2) Records and files related to expectant mothers under its care, records and files relating to applicants and prospective adoptive parents, and ... records and files relating to various organizations involved in the adoption field ... that may be a source for babies in need of adoption; (3) Reasonable expectations that Easter House's applicants or prospective adoptive parents may ... [obtain] a child from Easter House or have ... a home study [conducted] by Easter House; and (4) The legal right to the exclusive use of the name Easter House in connection with an adoption agency in Illinois.

**12.** Such interim practice was supported, if not explicitly authorized at that time, by section 9(b) of the Child Care Act, which allowed agencies to continue to operate pending judicial review of a DCFS decision to revoke, suspend, or withhold renewal of a license unless the DCFS issued an order "directing that the operation of the facility terminate immediately." 1969 Ill. Laws 106 (current version as amended at Ill. Rev.Stat. ch. 23, ¶ 2219(b) (1988)). Thus, if agencies could continue operations even after an administrative determination that they should not be relicensed, it would seem unreasonable to require them to cease operation while an administrative determination was pending.

Easter House further argues that its reading of the letters is supported by the DCFS's January 10th letter to Judge Comerford advising him that Easter House was no longer licensed and the appellants' statements to the prospective job applicant and prospective adoptive parents who inquired about Easter House's status.

The appellants respond that Easter House misreads the January 6th letter or at least improperly attempts to read the letter without considering the surrounding facts and circumstances. They point out that Easter House did not receive the letter until January 21 when it also received the January 8th letter which allowed it ten days to request a hearing before denial of its application for renewal would become final. Thus, the January 8th letter could be viewed as having restored Easter House to interim operating status—a status which, under the statute, the DCFS could revoke only after (1) holding a formal hearing, (2) reaching a decision adverse to Easter House, and (3) either issuing an order requiring immediate termination of operations or obtaining a court order affirming its determination.

Fortunately, we need not resolve this issue definitively. We are not wholly convinced that a deprivation of constitutional magnitude occurred in light of the DCFS's January 8th letter granting Easter House an opportunity to request a predeprivation hearing. Nevertheless, because the appellants may have undercut the value of Easter House's "legal license" by their communications with Judge Comerford and the potential employees and adoptive parents, we will assume that such a deprivation occurred. We thus turn to the more challenging issue presented by this appeal.

### 2. Due Process Guarantees After Parratt

The appellants contend that Easter House received all of the process which was due and that it cannot maintain a section 1983 action in light of the Supreme Court's pronouncements in the *Parratt* line of cases. In *Parratt*, the Supreme Court held that a random and unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the due process clause of the fourteenth amendment if a meaningful post-deprivation remedy for the loss is available. We therefore must determine whether the appellants' alleged misconduct was both random and unauthorized and, if so, whether meaningful post-deprivation remedies exist to redress any losses suffered. We will begin our analysis by briefly reviewing the relevant Supreme Court holdings.

#### a. *Parratt and Its Progeny Generally*

In *Parratt*, a state prisoner sued prison officials under 42 U.S.C. § 1983, alleging that their negligent loss of a hobby kit, which the prisoner had ordered from a mail-order catalog, deprived the prisoner of property without due process of law in violation of the fourteenth amendment. The Supreme Court disagreed, noting that nothing in the fourteenth amendment protects against all deprivations of life, liberty, or property, and instead prohibits only those deprivations which occur without due process of law. 451 U.S. at 537, 101 S.Ct. at 1914. The Court then rejected the proposition that a state is always required to provide a hearing prior to a deprivation. 451 U.S. at 540, 101 S.Ct. at 1915. The Court stated that:

> either the necessity of quick action by the State or the impracticality of providing any meaningful deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking ... satisf[ies] the requirements of procedural due process.

451 U.S. at 539, 101 S.Ct. at 1915 (footnote omitted).

The Court noted that the state had promulgated predeprivation procedures which were adequate to protect the plaintiff's property interests, but that the state employee failed to follow the established policy. 451 U.S. at 543, 101 S.Ct. at 1917. The Court concluded that situations "involving a tortious loss of ... property as a result

of a random and unauthorized act by a state employee," which by definition is not a loss resulting from some "established state procedure," are beyond the state's control and cannot be predicted. 451 U.S. at 541, 101 S.Ct. at 1916. The Court consequently held that negligent deprivations which occur without a prior hearing do not violate the fourteenth amendment's due process clause as long as the state provides a "meaningful post-deprivation remedy." 451 U.S. at 544, 101 S.Ct. at 1917. To hold otherwise, the Court opined, would "result in turning every alleged injury which may have been inflicted by a state official acting under 'color of state law' into a violation of the Fourteenth Amendment under § 1983, ... [and] 'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" 451 U.S. at 544, 101 S.Ct. at 1917 (citations omitted).

The Court reaffirmed the *Parratt* rationale in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). In *Logan*, a plaintiff filed a timely charge of unlawful conduct with a state employment commission. According to state law, the commission then had 120 days in which to convene a fact-finding conference. However, through the commission's inadvertence, it scheduled the plaintiff's hearing five days beyond the jurisdictional deadline and subsequently refused to consider the claim.

The Supreme Court held that *Parratt* did not bar the plaintiff's section 1983 action, based upon the fourteenth amendment's due process clause, because the plaintiff was not challenging the commission's error. Instead, the Court believed that the plaintiff was challenging an inadequate "'established state procedure' that destroys his entitlement without according him proper procedural safeguards." 455 U.S. at 436, 102 S.Ct. at 1158. The Court noted that "it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference...." 455 U.S. at 436, 102 S.Ct. at 1158. In contrast, *Parratt* dealt with a

state agent's failure to follow otherwise adequate established state procedure. *Id.* The Court concluded that post-deprivation remedies "do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action." *Hudson v. Palmer*, 468 U.S. 517, 532, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984) (footnote omitted) (interpreting *Logan*, 455 U.S. at 435–36, 102 S.Ct. at 1158).

Finally, in *Hudson v. Palmer*, the Court extended *Parratt* to cover the random and unauthorized "intentional conduct" of state employees. In that case, a federal inmate brought a section 1983 action against a correctional officer for depriving him of certain property without due process of law. During a shakedown of the plaintiff's cell, the officer apparently destroyed certain noncontraband personal items of the plaintiff. The Court found that the officer's intentional conduct fell within the *Parratt* doctrine. The Court reasoned that "a state can no more anticipate and control in advance the random and unauthorized conduct of its employees than it can anticipate similar negligent conduct." *Hudson*, 468 U.S. at 533, 104 S.Ct. at 3203. It also rejected an argument that "because an agent of the state who intends to deprive a person of his property '*can* provide predeprivation process, then as a matter of due process he must do so.'" 468 U.S. at 534, 104 S.Ct. at 3204 (emphasis in original). The Court believed that the "controlling inquiry is whether the state is in a position to provide for predeprivation process." *Id.*

#### b. *Applying Parratt in this Appeal*

Easter House argues that the appellants' conduct cannot be characterized as random or as unauthorized under *Parratt*. It contends that *Parratt* and its progeny do not apply where a property deprivation results from the action of "high-level state and local officials" who are "engaged in a conspiracy to violate a citizen's constitutional rights." This argument has three subparts: (1) that *Parratt* and its progeny are limited to minor deprivations of property; (2) that an "intentional conspiracy" can

never be characterized as "a random act"; and (3) that the failure of high-level state employees, who are charged with providing the state's established due process protections, to grant admittedly practicable predeprivation relief automatically translates into an "established state procedure" and thus is *per se* "authorized." Finally, Easter House suggests that, even assuming that the appellants' conduct may be characterized as random and unauthorized, no meaningful postdeprivation remedies exist to provide the requisite due process protection. We address each of these arguments separately.

### i. Minor -vs- Substantial Deprivations of Property

Easter House relies upon *Bretz v. Kelman,* 773 F.2d 1026 (9th Cir.1985) (en banc), to support its contention that *Parratt* and *Hudson* only apply in cases involving minor deprivations of property. In *Bretz,* the Ninth Circuit Court of Appeals, sitting *en banc,* considered a plaintiff's claim that police, prosecutors, and various personal enemies conspired to accuse and prosecute him falsely for burglary. The court held that *Parratt* did not apply because it is "directed at minor infractions of prisoner interests." *Id.* at 1031. Because the court was presented with a suit involving the deprivation of a liberty interest, it declined to apply *Parratt.*[13]

At least one court has disagreed with the *Bretz* court's statement that *Parratt* and

*Hudson* only address minor deprivations, whether deprivations of property or liberty interests. In *Holloway v. Walker,* 790 F.2d 1170 (5th Cir.1986), the Fifth Circuit Court of Appeals expressly rejected *Bretz,* stating, "Nothing in *Parratt* or *Hudson* suggests that the holdings of these cases are confined to minor deprivations of ... property. If the Supreme Court intended to announce a constitutional rule of lex non curat de minimis, it would have said so." *Id.* at 1172.[14]

■ We find *Holloway* more persuasive than *Bretz.* The Supreme Court's pronouncements in *Parratt* and *Hudson* do not lend themselves to limitations based upon the size and nature of the injuries suffered. *Accord Kauth v. Hartford Ins. Co.,* 852 F.2d 951 (7th Cir.1988) (although not addressing this argument specifically, we applied *Parratt* to claims for damages in excess of $17,000.00). Further, we find it difficult to believe that the Supreme Court would base a constitutional principle solely upon the value of property involved and afford greater protection to persons possessing greater wealth of which they were deprived. Finally, an employee's actions are no less "random" or "unauthorized" because they result in an injury of greater monetary consequence. We therefore reject Easter House's attempt to place a "de minimis" limitation upon *Parratt* and *Hudson.*

---

13. In *Labov v. Lalley,* 809 F.2d 220 (3d Cir. 1987), the Third Circuit Court of Appeals also limited *Parratt* and *Hudson* based upon the nature of the plaintiff's action. In that case, the court considered a plaintiff's claim that former Sheriff's Department employees, the Sheriff, and various County Commissioners, among others, conspired to deprive him of certain property and liberty interests in violation of the first amendment for attempting to organize a collective bargaining unit in the Sheriff's office. *Id.* at 222. The court held, *inter alia,* that *Parratt* and *Hudson* do not deal with "intentional deprivations of federal substantive liberty interests protected by the first amendment." *Id.* Instead, the court found that those cases are limited to deprivations of property and hinted that it also believed that the cases only address minor deprivations of property, although it never expressly so stated. *Id.* at 222–23.

14. The Fifth Circuit Court of Appeals also held that *Parratt* addresses cases involving deprivations of liberty interests as well as cases involving deprivations of property interests. *Holloway,* 790 F.2d at 1172. The Sixth Circuit has agreed. *See, e.g., National Communications Sys., Inc. v. Michigan Public Service Comm'n,* 789 F.2d 370, 373 n. 2 (6th Cir.1986). Language in two more recent Supreme Court opinions, as well as in *Parratt* itself, may support these courts' decisions. *See Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 665–66, 88 L.Ed.2d 662 (1986). Although we are not squarely confronted with the issue by this appeal, we agree with the Fifth and Sixth Circuits that an argument may exist for extending *Parratt* to actions involving deprivations of liberty interests. However, we need not decide this issue today.

### ii. Conspiracies as Random and Unauthorized Conduct

Easter House next contends that because the appellants' actions were undertaken as part of a conspiracy to deprive it of constitutionally protected rights, their conduct cannot be characterized as "random" under *Parratt.* Easter House again relies upon the Ninth Circuit's decision in *Bretz,* and finds further support in the Third Circuit Court of Appeals' decision in *Labov v. Lalley,* 809 F.2d 220 (3d Cir.1987).

In *Bretz,* the Ninth Circuit was impressed by the plaintiff's decision to plead the existence of injuries resulting from a conspiracy by certain governmental officials to arrest and try him upon allegedly false burglary charges. With little discussion, it held that "by definition," a conspiracy "cannot be a random act, even if it was accomplished without the endorsement of the state governmental apparatus." 773 F.2d at 1031.

In *Labov,* the Third Circuit Court of Appeals considered a complaint which pleaded a conspiracy to deprive the plaintiff of "substantive liberty interests under the first amendment." The court agreed with the *Bretz* court's holding, stating that *Parratt* and subsequent cases "do not apply to charges of intentional conspiratorial conduct under color of state law. Such conduct, if it can be proved, is not the kind of isolated, unpredictable, and thus unpreventable conduct with which the Supreme Court purports to deal in the *Parratt v. Taylor* line of cases." 809 F.2d at 223 (citing *Davidson v. O'Lone,* 752 F.2d 817, 828 (3d Cir.1984), *aff'd sub nom. Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)).

In contrast, the Fifth and Sixth Circuit Courts of Appeal rejected the *Bretz* court's *per se* conspiracy rule. In *Holloway,* the Fifth Circuit held that a conspiracy in fact may be a random act if, "[f]rom the point of view of the state[,] ... the state cannot anticipate or control such conduct in advance." 790 F.2d at 1172 (citing *Hudson,* 468 U.S. at 533, 104 S.Ct. at 3203). The court reasoned, "Of course, a conspiracy is not random from the point of view of the conspirators but this is to say no more than that a conspiracy is an intentional act, rather than a negligent one. The effect of the Ninth Circuit's holding is to revive the intentional/negligent act distinction, rejected in *Hudson,* in another form." *Id.; accord Fields v. Durham,* 856 F.2d 655, 657 (4th Cir.1988), *pet. for cert. filed* (Dec. 12, 1988). Similarly, in *National Communications Sys., Inc. v. Michigan Public Service Comm'n,* 789 F.2d 370, 372–73 (6th Cir.1986), the Sixth Circuit Court of Appeals rejected a *per se* conspiracy rule, likewise reasoning that a conspiracy allegation is merely another form of intentional conduct which *Parratt* clearly addresses after *Hudson.*

We again agree with the Fifth Circuit's reading of *Parratt* and *Hudson.* The focus always must be whether, from the state's point of view, the employees' actions were "random and unauthorized." Whether the injuries suffered resulted from the concerted actions of several state employees or merely the action of a single employee is irrelevant. Only if a plaintiff can demonstrate that the substantive nature of the alleged improper conduct was either authorized or not random do *Parratt* and *Hudson* become inapplicable. As the Supreme Court noted in *Hudson,* "intentional acts are even more difficult to anticipate because one bent on intentionally depriving a person of his property might well take affirmative steps to avoid signalling his intent." 468 U.S. at 533, 104 S.Ct. at 3203–04. We believe that this rationale may apply even more strongly when the intentional conduct alleged involves a full-blown, multi-facted conspiracy. We therefore reject Easter House's reliance upon an absolute rule that a conspiracy is *per se* non-random conduct.

Nevertheless, Easter House also apparently believes that because the alleged licensing conspiracy had two separate prongs, the renewal application and the Easter House II charter application, then the conspiracy involved multiple acts which even under a traditional *Parratt* inquiry takes the conspiracy outside the realm of random. However, from the state's per-

spective, this characterization of the alleged scheme is inaccurate. Both prongs of the single conspiracy operated simultaneously. The state had no opportunity to discover that the appellants were disregarding the established state procedures for renewing licenses and granting charter applications.

 Easter House cannot demonstrate that the appellants' actions, even if involving a conspiracy to destroy Easter House, were anything but a single instance of improper conduct involving multiple employees engaged in a single scheme for a relatively short period of time. The licensing conspiracy remains nothing more than a random decision of state employees to disregard state policy and procedure which resulted in injuries to Easter House. As a result, Easter House has failed to demonstrate how the existence of a conspiracy removes this case from the dictates of *Parratt*.

### iii. Employee Status and the Definition of Random and Unauthorized Conduct

Easter House next argues that the appellants' status as "high-level state employees or officials" automatically renders *Parratt* inapplicable. It believes that the actions of such employees cannot be characterized as either "random" or as "unauthorized." We thus must determine whether *Parratt* contemplates an employment status-conscious exception to its application.

In *Taverez v. O'Malley*, 826 F.2d 671 (7th Cir.1987), we noted that the phrase "random and unauthorized" may be interpreted both narrowly and broadly. When read narrowly, the phrase "merely identifies the situation where a predeprivation remedy is infeasible because the officials authorized to grant such a hearing are unaware of the deprivation before it occurs." *Id.* at 677; *see also Matthiessen v. Board of Educ.,* 857 F.2d 404, 407 n. 3 (7th Cir.1988); *Wilson v. Civil Town of Clayton,* 839 F.2d 375, 380 (7th Cir.1988). "This may be because 'the person committing the unconstitutional act may be employed at such a low level of state or local government that the official authorized to grant a pre-depriva-

tion hearing would be unaware of the person's actions.' " *Matthiessen,* 857 F.2d at 407 n. 3 (quoting *Wilson,* 839 F.2d at 380).

However, when interpreted more broadly, the phrase may "place[ ] beyond the reach of section 1983 any loss that 'is not a result of some established state procedure,' [*Parratt,*] 451 U.S. at 541, 101 S.Ct. at 1916, even if the loss might have been averted by a predeprivation hearing." *Tavarez,* 826 F.2d at 677; *see also Matthiessen,* 857 F.2d at 407 n. 3; *Wilson,* 839 F.2d at 380. "In such a case the state cannot predict when a loss will occur." *Matthiessen,* 857 F.2d at 407 n. 3 (citing *Wilson,* 839 F.2d at 380); *see Daniels v. Williams,* 474 U.S. 327, 339–40, 106 S.Ct. 662, 678–79, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring) ("[A] complaint does not state a valid procedural due process objection—and a valid § 1983 claim—if it does not include a challenge to the fundamental fairness of the State's procedures.... [I]f a procedural due process claim lacks a colorable objection to the validity of the State's procedures, no constitutional violation has been alleged." (footnote omitted)).

In *Tavarez,* as well as in *Matthiessen,* we intimated that perhaps a narrower reading of *Parratt* might be wise to protect the important purposes which section 1983 serves. However, in *Kauth v. Hartford Ins. Co.,* 852 F.2d 951 (7th Cir.1988) (considering *Parratt*'s application to both procedural and substantive due process claims), we also recognized that we must give meaning to the policies underlying *Parratt* and subsequent cases—that is, the stated purpose of discouraging the use of section 1983 as a supertort remedy to supplant existing state remedial procedures. We therefore must apply *Parratt* in a manner which balances these competing interests.

Easter House argues that a very narrow reading of *Parratt* is appropriate because of the employment status of the state employees involved. It correctly notes that *Parratt* is based upon the principle that a state should not be held accountable for deprivations when a predeprivation hearing is "impracticable." It then contends that,

because the appellants were "high-ranking state and local officials" who had the authority to provide the due process protections which the state had put in place, their failure to provide these protections cannot be characterized as random and unauthorized conduct.

In *Hudson,* the Supreme Court addressed a very similar argument. There, the Court stated:

[The plaintiff] contends that, because an agent of the state who intends to deprive a person of his property *"can* provide predeprivation process, then as a matter of law he must do so." ... This argument reflects a fundamental misunderstanding of *Parratt.* There, we held that postdeprivation procedures satisfy due process because the *state* cannot possibly know in advance of a negligent deprivation or property. Whether an individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process.

468 U.S. at 534, 104 S.Ct. at 3204 (emphasis in original).

In *Parratt,* the Court did not face a situation where "high ranking" officials had refused to follow adequate state procedures. Nevertheless, the Court noted that an adequate state procedure existed and that a person who, regardless of rank, could have provided the protection chose not to do so. 451 U.S. at 531, 543–44, 101 S.Ct. at 1910, 1917. The Fifth Circuit Court of Appeals, and more recently the Fourth Circuit Court of Appeals, have interpreted *Hudson* and *Parratt* as foreclosing the *per se* status-conscious exception argument which Easter House makes today.

In *Holloway,* the Fifth Circuit held that *Parratt* and *Hudson* are not confined "to the actions of low level state employees who lack the power to grant a hearing." 790 F.2d at 1173. The court went on to state:

If laws and regulations providing due process exist in theory but are systematically ignored in fact then clearly a

deprivation of liberty or property, though technically unauthorized by these laws, would not be "random." On the other hand, if the state system, by procedure and in ordinary practice, does in fact provide the plaintiff with due process, no violation of the guarantee contained in the national constitution occurs merely because the official who randomly deprives him of liberty or property without the hearing required by state law has the power to grant such a hearing.

*Id.* In effect, the Fifth Circuit decided that a broader reading of *Parratt* was appropriate.

In *Fields,* the Fourth Circuit Court of Appeals adopted the Fifth Circuit's rationale. In that case, the Fourth Circuit considered a plaintiff-college dean's claim that the college president, the college, the board of trustees, the Mayor of Baltimore, and the Baltimore City Council violated his due process rights by their failure to follow the procedures required by the college's by-laws and the terms of his employment agreement in connection with his discharge. 856 F.2d at 656. The court rejected the plaintiff's attempts to distinguish *Parratt* and *Hudson* because the defendants in his case were high-ranking officials who were charged with the responsibility of providing the due process protections which the state had guaranteed in writing.

The Fourth Circuit discussed and adopted the *Holloway* court's analysis, stating, "High-ranking officials are bound by the rule of law and their departures therefrom, no less than those of others, are subject to the *Parratt* holding. The theory of *Parratt*—that the states possess the primary opportunity to redress unauthorized deprivations of property interests— applies [to such] alleged deprivations in full force." *Id.* at 659. The Sixth Circuit apparently agrees with these courts' reading of *Parratt. See National Communications Sys.,* 789 F.2d at 372–73 (court stating that *Parratt* applies to conspiratorial acts "where the alleged conspirators are the public officials whose duty it was to see

that plaintiffs were not denied due process").

We believe that the Fourth, Fifth, and Sixth Circuit Courts of Appeal have correctly refused to focus solely upon the employment status of the state employee in determining the applicability of *Parratt.* The inquiry which the Supreme Court deems relevant is whether the employee's actions were random and unauthorized from the state's perspective, not whether the employee held any certain position in the governmental hierarchy. Thus, we refuse to hold that *Parratt* and its progeny do not apply in cases involving a "high-ranking" state or local official's failure to provide the due process protection when that official has the authority and duty to do so.

Easter House cannot demonstrate that the appellants alleged improper activity was anything other than a random occurrence. It points to nothing which indicates that the state knew or should have known that the appellants or other state employees had disregarded, or were likely to disregard, the state's formal policy and established procedure under these circumstances thereby perhaps "implicitly authorizing" the transgressions. Thus, the state could not foresee the appellants' actions or formulate procedures to safeguard against their actions. We therefore conclude that *Parratt* controls regardless of the appellants' employment status.

Easter House next argues that even under a broader reading of *Parratt,* which requires proof that a loss occurred because the state itself adopted an inadequate policy or procedure, the employment status of the appellants renders *Parratt* inapplicable. It asserts that "the single act of a sufficiently high-ranking policymaker may equate with or be deemed established state procedure...." *See, e.g., Matthiessen,* 857 F.2d at 407 n. 3; *Taverez,* 826 F.2d at 677; *see also Dwyer v. Regan,* 777 F.2d 825, 832–33 (2d Cir.1985); *Stana v. School Dist. of City of Pittsburgh,* 775 F.2d 122, 130 (3d Cir.1985); *Bretz,* 773 F.2d at 1031; *Fetner v. City of Roanoke,* 813 F.2d 1183, 1185 (11th Cir.1987) (rationale reaffirmed by a plurality of the court, sitting *en banc,* in *Burch v. Apalachee Community Mental Health Services,* 840 F.2d 797, 801–02 (11th Cir.1988)). Easter House contends that the appellants qualify as sufficiently high-placed policymakers whose allegedly improper conduct constitutes an inadequate "established state procedure" under *Logan,* thereby precluding the application of *Parratt,* even though the conduct contravened formal state policy and procedure as expressed in written statutes, regulations, and procedural manuals. *See Matthiessen,* 857 F.2d at 407 n. 3.

We do not disagree that the acts of a state employee are attributable to the state itself. However, in the *Parratt* analysis, this principle means nothing more than an employee acts under color of state law during the performance of his job-related duties. The issue is whether a single act of employee misconduct, which clearly contravenes established state policy and procedure as contained within formal rules, regulations, and statutes, automatically becomes the state's new position in all similar matters or whether the act, when viewed from the state's perspective, is merely a "random and unauthorized" deviation.

Without a doubt, the employee's position in the governmental hierarchy is relevant to this inquiry. For example, consider a variety of situations in which a state's policy and procedures in a given area are delegated to a specified policymaker, be it a single person, a committee, or the state legislature. If the policymaker establishes policy and procedure on an informal basis without the aid of formal policy and procedure guidelines, *i.e.,* decides policy on a case-by-case basis, then his pronouncement in a given case reflects the state's position. Thus, a party who suffers a loss without due process protection in his individual case may easily argue that the loss occurred as a result of an inadequate established procedure.

In another scenario, consider a policymaker, or series of policymakers, who establishes policy and procedure through a deliberative, or even legislative, process which culminates in a certain concrete posi-

tion expressed in formal pronouncements. In such a situation, it is reasonable to believe that only the results of that more formal process reflect the state's established policy and procedure. If the policymaker's subordinate, or even the policymaker himself, deviates in a single instance from the more formal pronouncement, it is less likely to reflect a new trend in state policy and procedure. A shift in policy is only likely to occur in one of two situations. First, a shift occurs if the same formal steps which created the original policies and procedures are repeated and culminate in the pronouncement of new policy and procedures. Second, a state's position may change if the policymaker repeatedly deviates from the formally established policy and procedure until his practice and custom has replaced the formal policy and procedures.

 We believe that this case more closely reflects the latter of these two possible scenarios. The state of Illinois established the DCFS's licensing procedures through the traditional legislative process. It created a body of concrete statutory law which established a step-by-step policy and procedure for granting and renewing the licenses of child welfare agencies, as well as provided the framework for the DCFS's own day-to-day policy and procedure manual. In effect, the "policymaker" is the state legislature. It is true that the state delegated some of the rulemaking power to the DCFS itself, but that entity likewise set its formal policies and procedures through a deliberative process which culminated in a set of formal rules and regulations. Thus, the combination of the state legislature's and the DCFS's formal pronouncements comprise the state's established procedure.

Because the state promulgated policy and procedure by formal means, the employment status of the state employee violating that procedure must be considered much less important in determining whether a deviation from the policy may be characterized as random and authorized under *Parratt*. Even if we assume that the appellants qualify as "policymakers" themselves—which we doubt given their position in the governmental hierarchy but will assume solely for the sake of analysis—their own "policy," which at absolute best may be characterized as informal, cannot be said automatically to preempt or displace otherwise adequate existing state policy and procedure. Because the state, through its designated policymaking branches, created its formal policies and procedures, we cannot entertain a claim that the single act of a state employee now reflects the state's established policies and procedures.

If, as Easter House contends, this case more closely resembled *Logan* than *Parratt* and *Hudson*, then we of course would be forced to find that the state's established procedure was itself inadequate to guarantee the requisite due process protection. In *Logan*, the state had passed a statute which required a claimant under the state's employment laws to file a claim with the state employment commission prior to filing a lawsuit. The law also required the commission to hold a hearing upon the claim within 120 days thereafter. However, the law further provided that the claimant's claim would be barred if for any reason the hearing was not held within 120 days, although the commission was required to grant the hearing automatically. When the commission failed to hold his hearing within 120 days which resulted in a jurisdictional bar to the claimant's employment claim, the claimant in *Logan* filed a section 1983 due process action.

The Supreme Court stated that the plaintiff's complaint should not be characterized as challenging the high-ranking state employees' failure to grant his requisite hearing in a timely manner when they had a duty to do so. Rather, the Court noted that the procedure itself was inadequate, not because the commission failed to grant the hearing, but because the statute contained a series of provisions which would allow a deprivation to occur "by operation of law" under a wide-variety of possible scenarios. 455 U.S. at 436, 102 S.Ct. at 1158. That is, because the law mandated the claimant to file a claim with the commission before he could proceed in court,

and because it further deprived the claimant of his claim without a hearing if *for any reason* a hearing on the claim was not held in 120 days, then the law itself was inadequate to protect the claimant's property interest in his claim.

In *Logan,* the state's procedure would have been adequate and the commission's actions arguably in question only if the state procedure had absolutely provided that no deprivation could occur without a hearing—rather than holding that a deprivation could occur without a hearing if the hearing was not held within 120 days—and the commission somehow managed to extinguish the claimant's claim without holding a hearing. Thus, contrary to Easter House's assertions, the high-ranking *Logan* defendants' failure to perform their duties did not constitute an "established state procedure"; the state statute itself was the inadequate component in the deprivation process.

In contrast, here the State of Illinois adopted a procedure which provided adequate due process protection; it contained no loopholes which would allow a deprivation to occur without due process unless the state employees acted in an unforeseen way. For example, the state's procedure detailed the method in which renewal licenses and charter applications should be handled. The law at that time even provided that in the case of the former a child welfare agency could continue to operate without a current license in hand while awaiting a final decision by the state and the courts upon its application for a renewal license. *See supra* note 12 (discussing 1969 Ill.Laws 106 (current version as amended at Ill.Rev.Stat. ch. 23, ¶ 2219(b) (1988))). Thus, the state procedure was adequate in and of itself unlike the procedural scheme promulgated by the state in *Logan.*

Only when the appellants took action which went beyond the realm of the foreseeable did Easter House suffer a property deprivation. If the appellants had merely refused to follow established procedure, Easter House still would have been able to operate pending a final determination by the courts. However, because the appellants took further steps—contacting the adoption court and responding incorrectly to inquiries by prospective parents and job applicants—Easter House arguably experienced a property deprivation. As a result, we believe that *Logan* is distinguishable and that *Parratt* provides the proper analysis.

We conclude that Easter House cannot maintain a section 1983 action in light of the Supreme Court's pronouncements in *Parratt* and its progeny. The Supreme Court has attempted to strike a balance between the competing interests of providing a remedy for injuries sustained in connection with violations of constitutional rights and avoiding the use of section 1983 as just another opportunity for parties to shop between state and federal forums. *See Holloway,* 790 F.2d at 1174. We believe that *Parratt* must be read broadly enough to avoid turning the fourteenth amendment into a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Parratt,* 451 U.S. at 544, 101 S.Ct. at 1917; *see also Daniels,* 474 U.S. at 332, 106 S.Ct. at 666.

Section 1983 must be preserved to remedy only those deprivations which actually occur without adequate due process of law, such as those which result from a *state*'s conscious decision to ignore the protections guaranteed by the Constitution. It should not be employed to remedy deprivations which occur at the hands of a state employee who is acting in direct contravention of the state's established policies and procedures which have been designed to guarantee the very protections which the *employee* now has chosen to ignore. Such a limitation upon section 1983 maintains the delicate balance between the state and federal judicial systems, leaving the former to remedy individual torts and the latter to address property deprivations which occur without adequate due process protection.

### iv. Adequate State Law Remedies

Having decided that the appellants' conduct may be characterized as random and

unauthorized under *Parratt*, we must decide whether meaningful postdeprivation remedies exist under state law. The parties have not discussed this issue at much length, leading us to believe that they have little disagreement that Illinois law provides Easter House with remedies to redress its injuries. Nevertheless, we will address some of the general concerns which Easter House's briefs suggest may preclude application of *Parratt*.

Easter House apparently believes that the remedies available under Illinois law are not as substantial as those available under section 1983. It also characterizes the state road to recovery as a "lengthy and speculative process," especially in light of the appellants' potential qualified immunity claims. As a result, it contends that the state has not provided it with a "meaningful postdeprivation procedure" as contemplated by *Parratt*.

Initially, we note that Easter House may seek a wide variety of relief under numerous legal theories. For example, Illinois common law provides a former employer with a remedy against a former employee who solicits key clients and improperly exploits benefits gained by his or her prior employment. *See, e.g., Corroon & Black of Ill., Inc. v. Magner*, 145 Ill.App.3d 151, 98 Ill.Dec. 663, 494 N.E.2d 785 (1986); *Smith–Shrader Co. v. Smith*, 136 Ill.App. 3d 571, 91 Ill.Dec. 1, 5–6, 483 N.E.2d 283, 289–90 (1985). In a similar vein, Illinois law recognizes a tort action which businesses may bring against parties which interfere with business relationships or their right to conduct business generally. *See, e.g., American Pet Motels, Inc. v. Chicago Veterinary Medicine Ass'n*, 106 Ill.App.3d 626, 62 Ill.Dec. 325, 435 N.E.2d 1297 (1982); *Streif v. Bovinette*, 88 Ill.App. 3d 1079, 44 Ill.App.3d 372, 411 N.E.2d 341 (1980). In addition, under Illinois law, an injured party may bring an action if a third party interferes with the injured party's contractual relations or if "tortiously inter-

feres" with the injured party's "prospective economic advantage." *See, e.g., Singh v. Curry*, 667 F.Supp. 603 (N.D.Ill.1987); *Williams v. Weaver*, 145 Ill.App.3d 562, 99 Ill.Dec. 412, 417, 495 N.E.2d 1147 (1986); *Galinski v. Kessler*, 134 Ill.App.3d 602, 89 Ill.Dec. 433, 437, 480 N.E.2d 1176 (1985).

Illinois courts also have stated that the right to do business constitutes "property," and access to one's place of business or the enjoyment of the good will attending it are incidents of "property," as respects liability for interference therewith. *See, e.g., Meadowmoor Dairies v. Milk Wagon Drivers' Union of Chicago*, 371 Ill. 377, 21 N.E.2d 308 (1939). Thus, a business may bring an action for the tort of malicious and wrongful impairment of property if it is based upon a civil wrong. *See, e.g., Nemanich v. Long Grove Country Club Estates, Inc.*, 119 Ill.App.2d 169, 255 N.E.2d 466 (1970). Finally, to protect its interest in exclusive use of its name, Easter House might bring a deceptive trade practice action under paragraph 313 of chapter 121½ of the Illinois Revised Statutes and seek both injunctive relief as well as any other "remedies otherwise available against the same conduct under the common law and other statutes of the state."

We believe that these potential causes of actions, among others, adequately afford Easter House "meaningful post-deprivation remedies" sufficient to provide the requisite due process protection.[15] As for Easter House's qualified immunity concerns, we do not think that the otherwise adequate state law remedies will be curtailed by the appellants' ability to avail themselves of the immunity which public officials ordinarily enjoy. Paragraph 801 of chapter 127 of the Illinois Revised Statutes prohibits suits against the State of Illinois, unless they are brought in the Illinois Court of Claims, Ill.Rev.Stat. ch. 37, ¶ 439.8. However, the Illinois Supreme Court has held that state employees are not granted immunity similar to that enjoyed by the state.

---

**15.** We believe that Easter House may have more state law remedies other than those causes of action listed herein. However, we need not discuss every possible theory of recovery to find that the available remedies are adequate to pro-

vide meaningful post-deprivation relief. We likewise do not intend to suggest that we believe that Easter House is absolutely entitled to recovery under any of these theories and leave the matter to the Illinois courts where it belongs.

*See, e.g., Senn Park Nursing Center v. Miller,* 104 Ill.2d 169, 83 Ill.Dec. 609, 470 N.E.2d 1029 (1984); *see also Smith v. Jones,* 113 Ill.2d 126, 100 Ill.Dec. 560, 562, 497 N.E.2d 738, 740 (1986) ("An action against a state official for conduct in his official capacity will withstand a motion to dismiss the complaint on sovereign immunity grounds if the complaint alleges that the official is ... violating the law of Illinois and thus acting beyond his authority."); *Children's Memorial Hosp. v. Mueller,* 141 Ill.App.3d 951, 96 Ill.Dec. 289, 491 N.E.2d 103 (1986) ("immunity extends not only to actions where the State is named as the defendant, but also to actions against State departments, such as DCFS, and State officers acting pursuant to their *lawful* authority" (emphasis added)); *see also generally National Communications Sys.,* 789 F.2d at 373 (discussing the adequacy of state law remedies in light of potential immunity claims and the principles established by *Hudson*).

Finally, we also must reject Easter House's characterization of the state recovery process as a "lengthy and speculative process" which forecloses the application of *Parratt.* In *Hudson,* the Supreme Court rejected an argument that state law relief should be deemed inadequate because it "is far from certain and complete." 468 U.S. at 535, 104 S.Ct. at 3205. The Court also stated that whether an injured party "might not be able to recover under [the state law] remedies the full amount which he might receive in a § 1983 action is not ... determinative of the adequacy of the state remedies." 468 U.S. at 535, 104 S.Ct. at 3204–05 (citing *Parratt,* 451 U.S. at 544, 101 S.Ct. at 1917); *see also National Communications Sys., Inc.,* 789 F.2d at 373.

We note that almost all litigation, whether conducted in a state or federal forum, may be characterized as a lengthy and speculative process. Litigants often decry the speed with which courts administer justice and likewise may lament that a particular forum may yield a more favorable result depending upon the nature of the claim and the particular position they support. However, we should not reject the application of *Parratt* unless the remedy which an injured party may pursue in state court can readily be characterized as inadequate to the point that it is meaningless or non-existent and thus in no way can be said to provide the due process relief guaranteed by the fourteenth amendment. Consequently, we hold that Easter House's arguments are misplaced.

■ Based upon our reading of *Hudson* and *Parratt,* we hold that adequate state remedies exist to correct any injuries which may have resulted from the appellants' improper conduct. We do not intend our decision to be read as foreclosing section 1983 actions any time a state provides an alternative forum for relief. However, when alternative relief exists and the facts of a case dictate the application of *Parratt* and *Hudson,* a plaintiff's due process rights are not violated and no basis for a section 1983 action exists. *See Kauth,* 852 F.2d at 955–56 ("if a state provides an adequate means of addressing a property deprivation, the victim of the deprivation has been accorded due process of law"); *id.* at 955 n. 8. Any action for injuries thus must be brought in the state forum. In summary, we hold that the *Parratt* line of cases preclude an action by Easter House pursuant to section 1983 for the injuries which resulted from the alleged licensing conspiracy because it received all of the process which was due.

### B. *The Conspiracy to Harass* [16]

We now must analyze the second count of Easter House's complaint, which seeks damages for the DCFS's repeated investigations in 1977, to determine whether it states a claim for relief under section 1983. Once again, the parties do not dispute that the appellants were acting under color of state law when they investigated Easter House. However, the appellants argue that Easter House cannot identify any "constitutionally protected interest" which

---

**16.** With his consent, we have adopted in large part the analysis set forth by Judge Cudahy in the original panel opinion. *See* 852 F.2d at 909–10.

was infringed by the investigations or, in the alternative, cannot demonstrate that the investigations constituted a deprivation of constitutional magnitude.

■ Easter House argues that it has a due process right "to be free from unfounded harassment." However, we agree with the appellants that Easter House has not identified any support for its argument that such a right exists or demonstrated whether this purported "right" implicates a property or liberty interest.

In substance, Count II of Easter House's complaint seems to be a claim for malicious prosecution. Ordinarily, a claim of malicious prosecution does not state a basis for relief under section 1983. *See, e.g., Antonelli v. Burnham,* 582 F.Supp. 1067, 1071 (N.D.Ill.1984) ("[M]alicious prosecution, standing alone, is insufficient to state a claim for relief under Section 1983."); *see also Grove School v. Guardianship & Advocacy Comm'n,* 642 F.Supp. 1043, 1048 (N.D.Ill.1986) (investigation by state regulatory authority does not violate Constitution merely because it may discredit views of school administrator). Only if a plaintiff, in addition to being the target of a properly motivated investigation, can demonstrate that he has been "subjected ... to a deprivation of constitutional magnitude" may we find that he may maintain a section 1983 action. *Hampton v. Hanrahan,* 600 F.2d 600, 630 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *see also Cameo Convalescent Center, Inc. v. Senn,* 738 F.2d 836, 845 (7th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985).

■ Clearly, unwarranted investigation by licensing officials, conducted in a manner calculated to discourage customers or interfere with a licensee's business, may violate a property right. *See, e.g., McGee v. Hester,* 724 F.2d 89, 92 (8th Cir.1983); *see also McGee v. Hester,* 815 F.2d 1193 (8th Cir.1987) (affirming jury verdict for plaintiff), *cert. denied,* ——U.S. ——, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987); *Reed v. Village of Shorewood,* 704 F.2d 943, 949 (7th Cir.1983) (opining that "harassment of customers, employees and relentless, baseless prosecutions" may constitute deprivation of property). However, Easter House's allegations of impropriety do not rise to the level of a property deprivation of constitutional magnitude. Easter House's only alleged injuries are the cost of answering the questions of the DCFS's investigator and making files available to them. Such "injuries" do not rise to the level of a constitutional deprivation of property. *See, e.g., Reichenberger v. Pritchard,* 660 F.2d 280, 285 (7th Cir.1981) ("legal fees expended by the plaintiffs in the administrative proceedings cannot qualify as a constitutional injury absent a showing of deprivation of constitutional magnitude"). We therefore hold that the district court erred in refusing to grant the appellants' motion for a directed verdict upon Count II of Easter House's complaint.[17]

## III. CONCLUSION

Today, we apply the principles established by a line of authority flowing from *Parratt v. Taylor* to maintain a delicate balance between the state and federal legislative and judicial systems. Where adequate postdeprivation remedies exist in a state to redress a property deprivation which has resulted from an employee's random and unauthorized deviation from established state policy and procedure, a party cannot maintain a section 1983 action because he has received all of the process

---

**17.** At trial, the district judge rejected the appellants' arguments that Easter House had not identified any constitutional objected interest which was infringed by the investigation or shown that it incurred any cognizable harm. He consequently sent the claim to the jury with an instruction that:

Easter House has a constitutional right and liberty to operate its business without unfounded harassment by State officials....

If you find that Easter House's due process rights were violated, but that it suffered no actual injury resulting from the violation, then you should award Easter House nominal damages in the amount of one dollar.

Because we believe that the district court should have granted a directed verdict on the second count of Easter House's complaint, we consequently hold that it erred in giving this instruction.

which was due. We therefore hold that *Parratt* controls Easter House's section 1983 claims against the appellants for their part in the alleged licensing and investigation conspiracies.

With respect to the licensing conspiracy, Easter House had a property interest in its 1974 renewal license, and we have assumed that the appellants deprived it of that right by participating in the alleged licensing conspiracy. Nevertheless, we specifically reject Easter House's arguments that (1) *Parratt* is limited to minor deprivations of property, (2) a conspiracy can never be characterized as involving random and unauthorized conduct, (3) the failure of high ranking state and local officials to provide the due process protections which the state has placed in their hands amounts to established state procedure which is *per se* authorized improper state activity, and (4) Illinois has failed to provide meaningful postdeprivation remedies.

With respect to the alleged conspiracy to harass, we conclude that Easter House has failed to support its assertion that it has a right "to be free from unfounded harassment." Easter House plainly has failed to demonstrate that it suffered a deprivation of constitutional magnitude sufficient to turn its malicious prosecution claim into one cognizable under section 1983. Consequently, the district court should not have submitted the claim to a jury.

The district court's decision therefore is REVERSED and we REMAND the case and ORDER the district court to enter judgment in favor of the appellants.

EASTERBROOK, Circuit Judge, concurring.

An adoption agency without the staff required by state law can't operate. Easter House concedes that for an extended period it lacked essential staff. It would be straightforward to hold that in such circumstances the Constitution does not require a hearing before the state may suspend the agency's license and tell other public officials (such as the Chief Judge of the Circuit Court) what it has done. See *FDIC v. Mallen*, 486 U.S. 230, 108 S.Ct.

1780, 1787–88, 100 L.Ed.2d 265 (1988). The parties have not made such an argument, so I join the majority's opinion, which assumes that a prior hearing was necessary and ably interprets *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). We have been told that *Parratt* allows a subsequent hearing to suffice only when "random and unauthorized" conduct makes it "impossible or impracticable to provide a meaningful hearing before the deprivation", *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 195, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985). The court today elaborates on "random and unauthorized". I wonder, however, whether the principle has a scope as limited as *Williamson County* suggests.

When a state official violates state law, the usual (and constitutionally appropriate) response is a suit in state court. See *DeShaney v. Winnebago County Department of Social Services*, —— U.S. ——, 109 S.Ct. 998, 1007, 103 L.Ed.2d 249 (1989); *Archie v. City of Racine*, 847 F.2d 1211, 1216–17 (7th Cir.1988) (en banc). At bottom, all this case is about—all most *Parratt* cases are about—is a state official's violation of state law. Instead of decking the state-law claim in constitutional garb, the victim should proceed to state court. Trying this as a "constitutional" case has delayed it for *thirteen years*. Litigation is slow and often unsatisfactory; constitutional litigation, with a cloud of ancillary issues from abstention to immunity, is slower and less satisfactory than the norm. Far better to treat state-law errors as just that, and get on with the remedy.

"Process is not an end of itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983). The process that is "due" under the Constitution depends on what is necessary to "protect a substantive interest". One way to protect the entitlement is with a foolproof system of prior hearings, followed by appellate review, restudy, and re-restudy un-

til there is no chance of error. No one supposes, however, that only a zero rate of error is constitutionally adequate, or that we should study every decision eternally. Delay, like process, may be costly. The incidence of the cost is different (delay injures those action would protect, such as persons seeking to place or adopt children), but the cost is no less real. And error is with us always. Even criminal courts, using the most elaborate procedures, allow some chance of convicting the innocent—and to minimize the rate of erroneous conviction they release many guilty persons, a troubling source of error from society's perspective. An alternate way to protect the entitlement is to have no "process" before the fact (other than the deliberation that precedes most human action, and the desire of persons to do the right thing), allowing prompt decision, and careful study plus damages afterward. Courts could require the wrongdoer to pay damages, achieving both compensation and deterrence. States could fire (or horsewhip) errant officials.

Which approach is superior depends on the costs of process, the costs of error (in both directions, for omissions to act can be disastrous), and the ability of subsequent remedies to deter and compensate. Most of our lives are lived out in the shadow of the second approach. People make, keep, or break contracts, then face the music in court. Employers hire and fire, design and release products, sell securities, and so on, knowing that damages remedies lie in wait. This usual system, a form of ex post settling-up, works best when the rate of error is low in the main and can be held within acceptable limits by the threat of damages. If things rarely go wrong (whether because there is a low native risk of error or because the threat of damages is a potent deterrent), it is far better to allow prompt action and conserve the legal system for the claim that something has gone amiss than it is to delay every decision and hold a costly hearing in every case. Donald Wittman, *Prior Regulation versus Post Liability: The Choice Between Input and Output Monitoring*, 6 J.Legal Studies 193 (1977).

Even when mistakes are sufficiently common (and costly when they occur) that a system of prior review is worthwhile, that system will not operate perfectly. A sensible approach to the design of procedures incorporates elements of the different approaches. Because no system is foolproof, we may choose to accept a little less accuracy from the prior review in exchange for a little more care in subsequent review. You can always trade off a somewhat weaker system of before-the-fact controls for better after-the-fact remedies: for example, informal hearings or consultation before decision, but more complete study plus damages later. The message of *Parratt* is that the Due Process Clause does not sit athwart this tradeoff. "[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). If the state designs a system of procedures—including both hearings before the event and processes afterward to correct miscues—that holds the rate of error adequately low in light of the costs of error (taking into account the speed and accuracy with which state courts rectify mistakes), it does not help understanding to call blunders in execution violations of the Constitution, as opposed to slip-ups inevitable in the administration of any human institution. When the net rate of error is low enough that the system satisfies constitutional norms, the exceptions—problems of implementation rather than design—should be seen as violations of state law without independent constitutional significance.

Judge Stevens made this point in *Bonner v. Coughlin*, 517 F.2d 1311, 1318–20 (7th Cir.1975), modified en banc, 545 F.2d 565 (1976), elaborating on the fact that the Clause is addressed to the "state" as an entity rather than any individual state actor. Although a particular state actor (a person acting "under color of state law") may violate another's rights, the "state" comprises not only such predators but also others who will put things right, including

a judicial system. To understand whether the "state" has acted without due process of law, we must examine the state's procedures as a whole. If the "state" puts things to rights after a state actor has misbehaved, the state has fulfilled its constitutional obligation to its residents. State courts offer "due process" to those complaining of private wrongs; state courts also may supply the process that is "due" when a state actor commits a wrong.

Emphasizing that due process means a system of procedures and entitlements does not mean that the state hasn't "really" acted until the last state actor has performed the last act. *Home Telephone & Telegraph Co. v. City of Los Angeles*, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913), rejected that position. Henry Paul Monaghan, *State Law Wrongs, State Law Remedies, and the Fourteenth Amendment*, 86 Colum.L.Rev. 979 (1986). See also *Ex parte Virginia*, 100 U.S. 339, 346–48, 25 L.Ed. 676 (1879). A deed with current effect may be state action, and unlawful (or unconstitutional) immediately, even though the state plans to reverse the action later. If the government builds a highway across your land, it has "taken" that land even though it plans to remove its concrete in 50 years. But asking *when* the state has acted distracts attention from the pertinent question: whether the state offers "due process of law" to those aggrieved by the proposed or completed act. Answering that question requires an understanding of many sequential acts even though the first deprivation is unquestionably state action—and is remediable by a federal court if the rest of the state's plans do not add up to due process.

From this perspective, whether the acts in question were "random and unauthorized" is important only to the extent the frequency of error conveys information about the adequacy of the state's procedural apparatus. Frequent errors, caused by features designed into the state's system, may show that the system does not deliver due process of law. E.g., *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). By the same token, action that *always* precedes

hearings may comply with the Due Process Clause if the state offers damages as balm, even though the Clause would require a prior hearing if there were no subsequent remedy. *Ingraham v. Wright*, 430 U.S. 651, 674–82, 97 S.Ct. 1401, 1414–18, 51 L.Ed.2d 711 (1977). *Ingraham*, which held that the Constitution allows teachers to paddle their pupils first so long as the state offers litigation later, is the progenitor of *Parratt*. *Ingraham* states the rule; *Parratt* is one implementation.

How much error is too much is of course the critical question. Justice Stevens thought that injuries caused by erroneous corporal punishment are too grave to rest content with subsequent litigation as the sole source of both deterrence and compensation. *Ingraham*, 430 U.S. at 701–02, 97 S.Ct. at 1427 (dissenting). Federal courts issue writs of habeas corpus when states have deprived persons of liberty through faulty procedures, even though the states' systems may function flawlessly in 99.44% of the cases. So we do not always define due process as a system of procedures adequate in the main. All the same, it is difficult to believe that the Constitution treats judicial hearings after the fact—the *model* of "due" process copied to greater or lesser degrees by agencies—as inadequate in the ordinary case of a public official's departure from rules prescribed by state law, rules that are constitutionally sufficient if followed.

If bureaucrats in Illinois routinely rode roughshod over adoption agencies, yanking licenses and spreading calumnies so often that these practices became "the state's" policy, and then huddled under a blanket of immunity, we could conclude that the state as an entity does not offer due process of law. This approach has obvious parallels to the question whether the seemingly unauthorized acts of public employees should be attributed to a local government for purposes of *Monell v. New York Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). E.g., *City of Canton v. Harris*, —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *City of St. Louis v. Praprotnik*, 485 U.S.

112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Our record does not suggest that the treatment Easter House received is the norm or that the threat of litigation in state courts is hollow. Even if the Constitution requires Illinois to offer adoption agencies prior hearings, litigation in state courts is all the process "due" when errors occur.

CUDAHY, Circuit Judge, with whom CUMMINGS, Circuit Judge, joins, concurring in part and dissenting in part:

As the majority opinion indicates, I was the author of the original panel opinion in this case, 852 F.2d 901, which reversed the "conspiracy to harass" count but affirmed the jury verdict on the licensing conspiracy count. I rely primarily on that opinion with respect to the issues addressed here.

This is a close case (and in fact one that originated 13 years ago and has now been before this court four times). But it seems to me to be close for reasons other than those relied on by the majority to reverse the jury verdict. Thus the key issue in the case seems to me to be whether Easter House was in fact deprived of a property interest. I am satisfied that, based on the jury verdict to the effect that it was, this issue favors the plaintiff, and the en banc majority does not disagree. There is also in this case a fairly close issue of qualified immunity. This was resolved favorably to the plaintiff by the panel and the en banc majority has not suggested a different result.

The issue whether the acts here were "random and unauthorized" of course did not even arise as a matter of theory until the case was well into middle age. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In addressing this issue, the panel relied primarily on *Tavarez*

*v. O'Malley,* 826 F.2d 671 (7th Cir.1987), a governing precedent in this circuit, which the majority here suggests would lead to the panel result rather than to the en banc outcome. ("In *Taverez,* as well as in *Matthiessen,* we intimated that perhaps a narrower reading of *Parratt* might be wise to protect the important purposes which section 1983 serves." *supra,* at 1470.) Since *Tavarez,* of course, there have been other decisions in other circuits that may lead us on a merry chase in attempting to resolve the problem at hand. But there is nothing in these decisions which should invalidate the well-buttressed panel result.

The majority here now says that the conspiratorial acts of the person who was *de facto* the ultimate decisionmaker (Felder) are "random and unauthorized" from the perspective of the "state". Who or what is the "state"? According to the majority, it is the legislature. And the acts of senior officials, which are alleged to be "unauthorized" by statute or regulation, are unforeseeable and hence not actionable. Only an "established state procedure" on all fours with the one in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), can give rise to a procedural due process claim for a property deprivation. Admittedly this rule has the virtue of drawing a bright line, although at the expense of withdrawing any civil rights remedy for the overwhelming bulk of official misconduct under color of state law that involves property. In theory some state remedies remain but the majority "flies low" over these—reinforcing the impression that they have slight practical significance.

Stripped of their analytical intricacies, *Parratt* and *Hudson* teach a fairly straightforward lesson (or so I had thought before today's decision): while the procedural aspect of the due process clause[1]

---

1. I must register my strong disagreement with Judge Easterbrook's suggestion, *supra,* at 1478, that *DeShaney v. Winnebago County Department of Social Services,* — U.S. —, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) or *Archie v. City of Racine,* 847 F.2d 1211 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989)

are relevant to the issues involved in the present appeal. To the contrary, I believe that these decisions have no relationship whatever to this case. *DeShaney* and *Archie* involved the "substantive due process" doctrine—*i.e.,* the theory that the due process clause itself creates certain substantive entitlements, and does not merely

generally requires that the state provide a hearing before it takes away someone's property, it is physically impossible to grant a predeprivation hearing where the taking is a "fluke", unplanned and uncontrollable. Such an accident occurs, for example, where a state employee who has no business meddling with anyone's property rights nevertheless deprives someone of property. (Note that in both *Parratt* and *Hudson* the employee who took the plaintiff's property was acting completely beyond the pale of his or her assigned responsibilities—in *Parratt,* by signing for (and thereby taking custody of) the plaintiff's package, in direct violation of prison rules; in *Hudson,* by destroying innocuous items of personal property during a search for contraband.) In these unpredictable and unpreventable situations (and in emergencies, where a pre-deprivation hearing is unwise) all that a state can realistically offer is a post-deprivation remedy; all that a federal court presented with a due process claim can do is assure itself that the state remedy is "plain, speedy and efficient." *See also Daniels v. Williams,* 474 U.S. 327, 342 n. 19, 106 S.Ct. 662, 680 n. 19, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring in the judgment) ("It borders on the absurd to suggest that a State must provide a hearing to determine whether or not a corrections officer should engage in negligent conduct.").

But the present case does not involve a "fluke" occurrence with a state officer acting entirely outside his lawful authority. Felder was authorized, at least *de facto,* to take the very kind of action involved here—grant, deny or refuse to renew adoption agency licenses. If the State gave Felder this authority, it could also have constrained his power by appropriate pre-deprivation procedures. (Recall that no argument is being made here that the State is

specify procedures to be employed where an independently derived entitlement is taken away. This theory might indeed become a "font" of constitutionalized torts. Here, however, the en banc majority accepts Easter House's argument that it had a preexisting property right under state law, independent of the due process clause. The constitutional issue presented here involves only the question of

itself liable for Felder's misdeeds.) I simply cannot believe that this is the sort of situation which the Supreme Court intended to address in *Parratt* or *Hudson.*

The metaphysics of "random and unauthorized" events is daunting. In fact, the dictionary definition of "random" as "lacking ... a regular ... pattern," *Webster's New International Dictionary* 1880 (3d ed. 1976), is reminiscent of an even more puzzling problem in metaphysics, the RICO "pattern". Presumably, the operative characteristic sought to be identified is foreseeability. Are individual acts of high state officials "foreseeable" by the "state" so that due process can be provided? It would seem logical that if the official in question were high enough up the ladder to provide the process which the Constitution required, then what was foreseeable by that official should be the relevant area for analysis. And, since everything in that area was by definition foreseeable by the official in question, the "random and unauthorized" test would be met. An official at the process-granting level (such as Felder) would in effect be the "state" for the purposes involved here. *See also Burch v. Apalachee Community Mental Health Servs., Inc.,* 840 F.2d 797, 802 (11th Cir. 1988) (en banc); *Bretz v. Kelman,* 773 F.2d 1026, 1031 (9th Cir.1985) (en banc).

To put matters somewhat differently, one might say that a state official's actions are foreseeable by the state where the state has vested that official, either *de jure* or *de facto,* with substantial discretionary authority to create, maintain or extinguish property rights of members of the public. In such a situation, the state has created a significant risk that the empowered official might arbitrarily deprive a citizen of property without adequate procedures; it can hardly be said that the erroneous taking of

what process was due Easter House before the state deprived it of what is conceded to be "property" in the constitutional sense. Whatever the validity of the "substantive due process" theory, it is clear that Easter House's claim has a much firmer grounding in the text of the fourteenth amendment than the arguments advanced in either *DeShaney* or *Archie.*

property was "unforeseeable" by the state which itself created the environment within which an unconstitutional deprivation could occur.[2] An official authorized to oversee and superintend individuals' property rights (such as Felder, who was in effect the "last word" on adoption agency licenses in the Chicago area) would, once again, be considered the "state" for purposes of the "foreseeability" analysis apparently mandated by *Parratt*.[3]

At least before today's decision, I would have thought it clear that the due process clause mandated notice and hearing for more than simply state action that was specifically authorized by state statute or regulation. Instead, I had thought that misconduct by officials supervising the state's procedural machinery, or officials granted discretionary authority over individuals' property rights, would be subject to the constitutional requirement that any deprivation be preceded by a meaningful opportunity to challenge the state's decision.

As Judge Easterbrook's concurrence explicitly acknowledges, the majority's insistence that an "established state procedure"

cause a property deprivation is reminiscent of the analysis employed in determining whether a municipality's "policy or custom" is responsible for the constitutional violations of municipal employees, so that the municipality is itself liable for the constitutional torts of its agents. *See generally Jett v. Dallas Indep. School Dist.,* — U.S. —, —, 109 S.Ct. 2702, 2722–24, 105 L.Ed.2d 598 (1989); *Canton v. Harris,* — U.S. —, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion); *id.* at 928 (Brennan, J., concurring in the judgment); *Erwin v. County of Manitowoc,* 872 F.2d 1292, 1297–99 (7th Cir.1989). However, the present inquiry is fundamentally different from the municipal liability question. The municipal liability doctrine does not *define* a constitutional violation; instead, the municipal liability inquiry only asks *who will pay* for a constitutional violation previously found to exist. In the municipal liability context, it may not be inequitable to deny the victim of a constitutional violation recovery from a particular source of compen-

2. Judge Easterbrook's concurrence suggests that pre-deprivation hearings are not required where, without prior hearings, "the rate of error is low in the main and can be held within acceptable limits by the threat of damages." *Supra,* at 1479. If such is the case, Judge Easterbrook would find that any remaining errors by state officials constitute "problems of implementation rather than design." *Id.* at 1479. While I might not quibble with these general statements (which would appear generally consistent with the balancing approach to due process questions adopted in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)), I do take issue with Judge Easterbrook's application of these principles to the present case. Here, while the misconduct complained of might be an isolated occurrence, the possibility that such errors might occur is inherent in the "design" of the state's procedural apparatus, which apparently grants broad authority over licensing decisions (in both their procedural and substantive aspects) to certain high-ranking DCFS officials, such as Felder. *See also Hudson v. Palmer,* 468 U.S. at 541 n. 4, 104 S.Ct. at 3208 n. 4 (Stevens, J., concurring) (*Paratt* and *Hudson* do not apply "to cases in which it is contended that the established prison procedures themselves create an unreasonable risk that prisoners will be unjustifiably deprived of their property"); *Parratt,* 451 U.S. at 546, 101 S.Ct. at 1918 (Blackmun, J.,

concurring) ("When it is possible for the State to contain and direct the intentional actions of its officials, it should be required, as a matter of due process, to do so.").

3. Without attempting to set forth an exhaustive catalogue, several circuit decisions have recognized that actions by a state official given extensive power to deal with individuals' property interests may violate the due process clause, even after *Parratt. See, e.g., Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1317 (9th Cir. 1989); *Gillihan v. Shillinger,* 872 F.2d 935, 939–40 (10th Cir.1989); *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 864 F.2d 1475, 1482 (9th Cir.1989); *Burch v. Apalachee Community Mental Health Servs., Inc.,* 840 F.2d 797, 801 (11th Cir.1988) (en banc); *Stana v. School Dist. of City of Pittsburgh,* 775 F.2d 122, 130 (3d Cir.1985); *Piatt v. MacDougall,* 773 F.2d 1032, 1036 (9th Cir.1985) (en banc); *Haygood v. Younger,* 769 F.2d 1350, 1357–58 (9th Cir.1985) (en banc), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). By rejecting what it characterizes as the "status-conscious exception" recognized in these and similar cases, the majority exacerbates (if it does not create) a circuit conflict, suggesting that the Supreme Court will be called upon to visit this murky area of the law yet again.

sation where the offending act was isolated or an aberration. But the calculus is quite different where the court seeks to deny that any constitutional violation ever occurred. To my mind, a property deprivation, even if isolated or aberrant, may violate due process if effected by high-ranking government officials vested with the *de facto* authority to finally determine an individual's property rights. *See also Rittenhouse v. DeKalb County*, 764 F.2d 1451, 1456 n. 5 (11th Cir.1985), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986). By requiring that the plaintiff point to an established state policy or custom which caused his or her property deprivation before a due process violation will be found, the majority in effect holds that "several must suffer [ ] before one [may] object." *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1722, 90 L.Ed.2d 69 (1986) (quoting *McCray v. New York*, 461 U.S. 961, 965, 103 S.Ct. 2438, 2440, 77 L.Ed. 2d 1322 (1983) (Marshall, J., dissenting from denial of certiorari)). I cannot understand, much less accept, this approach.

Another point of great difficulty is the availability of state remedies. The majority states that Easter House "may seek" a "wide variety of relief under numerous legal theories." It goes on to describe these arguable remedies as "potential causes of action." It dispatches the thorny question of immunity with a single paragraph and attempts no analysis in depth. I respectfully submit that rights conferred by the United States Constitution should not be denied a remedy without some serious investigation of the adequacy of alternative state procedures. *See also Gregory v. Town of Pittsfield*, 470 U.S. 1018, 1022–23, 105 S.Ct. 1380, 1382–83, 84 L.Ed.2d 399 (1985) (O'Connor, J., joined by Brennan and Marshall, JJ., dissenting from denial of certiorari).

As courthouse doors continue inexorably to swing shut, the protection of citizens against abuses of power shrinks to the point of disappearance. This seems to be the message of today's decision.