TRIAD ASSOCIATES, INC. d/b/a Guardian Security, J.K. Guardian Security Services, Inc. and K & J Management, Inc., Plaintiffs–Appellants,

v.

CHICAGO HOUSING AUTHORITY, Renault Robinson, James Thomas, George Cramer, Wilbert Allen, Brenda Gaines and Joseph Gardner, Defendants–Appellees.

Nos. 88–1353, 88–2830 and 88–2876.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1988.

Decided Dec. 26, 1989.

Order on Denial of Rehearing and Rehearing En Banc Feb. 15, 1990.

John L. Gubbins, Gubbins & Associates, Dan K. Webb, Winston & Strawn, Chicago, Ill., for plaintiffs-appellants.

Thomas E. Johnson (argued), Anthony J. Fusco, Jr., Chicago Housing Authority, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, WOOD, Jr., and KANNE, Circuit Judges.

KANNE, Circuit Judge.

In this consolidated appeal, plaintiffs below, Triad Associates, Inc., J.K. Guardian Security Services, Inc., and K & J Management, Inc., ("Triad" collectively), appeal the district court's grant of a motion to dismiss their complaint in favor of defendants ("CHA" collectively).[1] Triad further appeals the district court's subsequent award of attorney's fees and sanctions under Rule 11 and 42 U.S.C. § 1988 with regard to Counts II and IV.

In its complaint, Triad alleged that the CHA had discriminated against Triad on the basis of race and political affiliation. Specifically, the complaint alleged violations of 42 U.S.C. § 1983, based on first, fifth, and fourteenth amendment rights, as well as a § 1985(3) claim and a civil RICO action. In support of these allegations, Triad claimed that the CHA engaged in a "campaign of harassment" designed to deter Triad's political support for opponents of the administration of the late Mayor Harold Washington. Triad further alleged that this "campaign of harassment" was racially motivated. The district court dismissed the complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6).

Subsequently, the CHA motioned the district court to impose Rule 11 sanctions upon plaintiffs and/or to award attorney's fees under 42 U.S.C. § 1988. The CHA argued that Counts I thru IV were frivolous and not objectively warranted by existing law, that Triad failed to conduct a reasonable inquiry into the facts prior to

---

1. Triad brings this action against the Chicago Housing Authority and six named individuals in their individual capacities. Named as individual defendants are: Renault Robinson, Chairman of the CHA Board; James Thomas and Wilbert Allen, members of the CHA Legal Department; Joseph Gardner, Deputy Executive Director for Tenant Services; George Cramer, Deputy Executive Director of Finance and Administration; and Brenda Gaines, Executive Director of CHA since January, 1987.

filing suit, and that this litigation was pursued for an improper purpose. The district court ruled that Triad was subject to sanctions under Rule 11 and attorney's fees under § 1988 with respect to Counts II and IV. The CHA's motion with respect to Counts I and III was dismissed.

We affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL BACKGROUND

Triad Associates, Inc., d/b/a Guardian Security, is an Illinois corporation in the business of providing security, investigative and alarm services. J.K. Guardian, also an Illinois corporation, is in the business of providing security services. K & J Management manages and operates both Triad and Guardian. James Malinowski and Kenneth Kotz, the owners of Triad and Guardian, are white males.[2]

The Chicago Housing Authority, a municipal corporation, provides housing for low income families within the City of Chicago. The CHA is governed by a seven-member Board of Commissioners appointed by the Mayor of the City of Chicago. At all times relevant to this appeal, Renault Robinson was the Chairman of the Board of Commissioners.

Triad first began providing security services for the CHA in 1982. After his appointment as Chairman of the CHA Board by the late Mayor Harold Washington, Robinson allegedly began a campaign, with the aid of the other named individual defendants, to intimidate, harass, and ultimately drive white employees and contractors from the ranks of the CHA and replace them with black employees and contractors who supported the political aspirations of Robinson and the Washington administration. The manifestation of this "campaign" most germane to the issues presented today is Triad's contention that Robinson enlisted the services of Digby Detective and Security Agency ("Digby") and GEJ Security, both black-owned companies who allegedly supported Robinson and the Washington administration, to replace Triad in its provision of security services for the CHA.

Triad's assertion that the CHA engaged in a "campaign of harassment" to further this politically and racially motivated scheme is based upon the following specific allegations: (1) with only two days notice, the CHA replaced Triad with Digby at the CHA's senior housing operations; (2) the CHA falsely maintained that Victor Vrdolyak (brother of Washington arch-rival Edward Vrdolyak) owned and controlled Triad's business; (3) without requiring the same of black-owned firms, the CHA subjected Triad to extensive audits and inspections in an effort to intimidate and embarrass; (4) in order to allow black-owned companies to qualify for certain CHA security contracts, the defendants blocked the award of a CHA contract to Triad by lowering the bid standards after Triad's bid had been recommended to the Board for approval; (5) the CHA awarded security contracts to black-owned companies although Triad tendered lower bids; (6) the CHA attempted to stop Triad from commencing performance on the contract it had been awarded by requiring the immediate posting of a performance bond, and proof of insurance, and refusing to confirm the contract's start dates while giving the black-owned companies written confirmations of their start dates; (8) the CHA assigned a service contract for the CHA headquarters to Digby even though Digby did not bid on the contract; (9) the CHA refused to make timely payments for services provided; and (10) the CHA reduced the amount of services Triad performed.

In Count I of its seven-count complaint, Triad maintained that the CHA's actions violated their rights of free association and speech as guaranteed by the first and fourteenth amendments and § 1983. In Count II, Triad alleged a violation of their due process rights as guaranteed by the fourteenth amendment and § 1983. In Count III, Triad alleged that the CHA's actions deprived them of the equal protection of the laws under the fourteenth amendment and § 1983. Count IV alleged a conspiracy

**2.** Malinowski and Kotz have not filed suit in their individual capacities.

on the part of the CHA to deprive Triad of rights guaranteed by the Constitution and laws of the United States in violation of § 1985(3). Count V is a civil RICO action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d). In Counts VI and VII respectively, Triad alleged tortious interference with contract and breach of contract under Illinois state law. The district court dismissed Counts I thru V with prejudice. Counts VI and VII were dismissed without prejudice.

## II. ANALYSIS

The standard of review in determining the propriety of the grant of a motion to dismiss is well-established. As we stated in *Ed Miniat, Inc. v. Globe Life Insurance Group, Inc.*, 805 F.2d 732, 733 (7th Cir. 1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987), all well-pleaded facts in the plaintiff's complaint must be taken as true. Moreover, as the Supreme Court admonished in *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974):

> When a federal court reviews a sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits. Thus, a motion to dismiss for a failure to state a claim can be granted only if it appears beyond doubt that the plaintiff could prove no set of facts entitling him to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th

Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986).

Counts I–III of Triad's amended complaint pray for relief under the provisions of 42 U.S.C. § 1983. Section 1983, however, does not by itself confer any substantive rights. Rather, it is a remedial provision to be employed only in the event of the deprivation of some right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979). Thus, in order to withstand a motion to dismiss, Triad's complaint in Counts I–III must allege facts which, if believed, would show that the CHA was acting under color of state law and that its conduct deprived Triad of a right which was actually protected by the Constitution or laws of the United States. The district court dismissed all § 1983 Counts under this standard. We affirm with regard to Count I. With regard to the due process claim under Count II and the equal protection claim under Count III, however, we reverse and remand.

Count I: First Amendment Claim

In Count I of its amended complaint, Triad alleged that the CHA's conduct deprived them of their rights to free association and speech as guaranteed by the first amendment. Relying on this court's decision in *LaFalce v. Houston*, 712 F.2d 292 (7th Cir.1983), *cert. denied*, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984), and a subsequent decision by the third circuit, *Horn v. Kean*, 796 F.2d 668 (3d Cir.1986), the district court held that the first amendment does not prohibit a city's use of political criteria in awarding public contracts.[3] As such, the district court found that Triad had failed to state a claim entitling them to relief under § 1983

---

**3.** Without deciding the issue, the district court assumed for purposes of ruling on CHA's motion that Triad was in fact engaged in activity protected by the first amendment. Specifically, the district court concluded that an inference could be drawn from the totality of the circumstances that Triad did not support the late May-

or Washington or his administration and that the alleged actions on the part of CHA were in retaliation for these political beliefs. In that we agree with the district court that the first amendment does not protect contractors in the awarding of public contracts, we do not address the propriety of this initial assumption.

and dismissed that portion of the complaint.

Triad maintains that the district court's reliance on *LaFalce* and *Horn* was in error. Specifically, Triad argues that neither *LaFalce* nor *Horn* are applicable to the present circumstances in that Triad's circumstances are not those of an "unsuccessful bidder" as was the case in *LaFalce*, nor was Triad terminated from its contract solely as a result of the partisan effect of a change in the administration as in *Horn*. Moreover, Triad argues that neither of those cases involved the "campaign of harassment" to which Triad was allegedly subjected. In the alternative, Triad urges this court to reevaluate and overturn its decision in *LaFalce* in light of the Supreme Court precedent in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), wherein the Court held that non-policymaking, non-confidential public employees could not be discharged or threatened solely upon the ground of political belief.

We reject Triad's contention that the factual distinctions between this case and *LaFalce* and *Horn* mandate a different resolution of the first amendment issue. In *LaFalce*, this court held that the first amendment did not protect a contractor whose bid for a public contract was rejected solely because the owners of the business were not political supporters of the mayor. 712 F.2d at 293–94. This conclusion was premised, in large part, on a cognizable distinction between the first amendment associational interests of "indepen-

dent contractors" and "public employees" in this context. In his thoughtful opinion for the court, Judge Posner weighed the costs of further subjecting this country's long-established patronage system to first amendment scrutiny against the benefits to a contractor's exercise of first amendment rights and concluded that, in the case of contractors, the costs outweighed the benefits. Judge Posner was also cognizant of the narrow application which the Supreme Court intended for the principles announced in *Elrod* and *Branti*.[4] *See Fox & Co. v. Schoemehl*, 671 F.2d 303, 304–05 (8th Cir.1982). Based upon all of these factors, we declined to extend the protection granted in the *Elrod–Branti* line of cases to independent contractors.

Likewise, in *Horn v. Kean*, the third circuit held that independent contractors who had been replaced by the new state administration could not rely on the first amendment as a remedy for those dismissals. Concluding that the *Elrod–Branti* line of cases regarding discharge of public employees for partisan political reasons do not apply to independent contractors, the court ruled that the plaintiffs enjoyed no first amendment protection. *Horn*, 796 F.2d at 675–77.

While it is true that the instant case is not factually parallel to the circumstances that were presented for review in *LaFalce* and *Horn*, the rationales underlying those decisions instruct that the differences that do exist are not such that a differing result is mandated. Triad's business relationship vis-a-vis the City of Chicago is unquestionably one of an "independent contractor."[5]

---

**4.** As the Court stated in *Elrod*, "[a]lthough political patronage comprises a broad range of activities, we are here concerned only with the constitutionality of dismissing *public employees* for partisan reasons." 427 U.S. at 353, 96 S.Ct. at 2680 (emphasis added).

**5.** Triad maintains that they had an ongoing business relationship with the CHA for over five years. In addition, Triad argues that they had a written agreement with the CHA which they were performing with a high degree of professionalism. Furthermore, unlike the situation in *Horn*, Triad points out that the allegedly discriminatory acts of the CHA were not immediately preceded by a change in the administra-

tion but, rather, occurred much later. These facts, however, do not alter the fact that Triad is an "independent contractor" and not a "public employee."

In this regard, Triad argues that it has not simply been denied a contract or refused the opportunity to do business with the city. Rather, Triad argues that, like the plaintiff in *Lipinski v. Dietrich*, 578 F.Supp. 235 (N.D.Ind.1984), it had an existing benefit—a contract for services—that was taken away by the CHA. Regardless of this assertion, however, the fact remains that Triad is an "independent contractor." In light of this fact, the rationale underlying our decision in *LaFalce* and the third circuit's decision in *Horn* governs. *See also Fox & Co. v.*

The decisions in both *LaFalce* and *Horn* were grounded upon the distinction between "independent contractors" and "public employees" and the extent to which this distinction was dispositive of the first amendment issue. In that Triad is an "independent contractor", we hold that our decision in *LaFalce* is binding and that Triad is not protected under the first amendment in this context.

Alternatively, Triad asks that we reevaluate and overturn our decision in *LaFalce*. We decline to accept this invitation. As was noted in *LaFalce*, "[s]ome day the Supreme Court may extend the principle of its public-employee cases to contractors. But there are enough differences in the strength of the competing interests in the two classes of cases to persuade us not to attempt to do so." 712 F.2d at 295. In like manner, the third circuit in *Horn* stated, "[a]s the force of a first amendment assault on state patronage practices moves from public employment into the outer spheres of political life, we are extremely hesitant to realign radically, in the name of the Constitution, a political constellation that has been with us since the Republic was formed." 796 F.2d at 677. Thus, to the extent the protection granted to public employees under the *Elrod–Branti* line of cases may be extended to contractors, we leave that extension to the Supreme Court. *Cf. Rutan v. Republican Party of Illinois*, 868 F.2d 943 (7th Cir.1989), cert. granted, — U.S. —, 110 S.Ct. 48, 107 L.Ed.2d 17 (1989).

## Count II: Due Process

■ In Count II of its complaint, Triad alleged that various actions on the part of the CHA denied them due process of the law as guaranteed by the fourteenth amendment. Specifically, Triad alleged that the CHA's alleged breach of a March, 1986 service contract and the subsequent transfer of the work provided for therein to other firms, without cause or a hearing, denied them of their due process rights. Additionally, Triad alleged that the CHA's alteration of the bidding requirements for a 1985 public works contract, for which Triad had successfully bid and been recommended, deprived them of their due process rights. Concluding that Triad had not alleged a constitutionally protected property interest in either allegation, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the district court dismissed Triad's due process claim.

In order to support a claim for a violation of due process, Triad must show that it had a protectible property or liberty interest that was taken away by the CHA without a hearing. *Miller v. Henman*, 804 F.2d 421 (7th Cir.1986), cert. denied, 484 U.S. 844, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987). Moreover, this property interest must be more than a unilateral expectation—it must be a legitimate claim of entitlement. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709; *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1080 (7th Cir.1987), cert. dismissed, 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988). Finally, "[p]roperty interests ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709; *Perry v. Sindermann*, 408 U.S. 593, 604, 92 S.Ct. 2694, 2717, 33 L.Ed.2d 570 (1972) (Burger, C.J., concurring).

Confronted with this precedent, Triad initially argued that the CHA's alleged breach of the March, 1986 services contract and the subsequent award of those services to other firms constituted a denial of due process. The CHA pointed out, however, that under Article Three of the contract in question the CHA is given:

complete discretion to determine from time to time the quantity, location, deployment and type of services to be provided. *CHA is not, by this Agreement, obligated to obtain from Contractor*

*Schoemehl*, 671 F.2d 303 (8th Cir.1982) (City auditors/independent contractors who were dismissed from their employment based on political reasons were not protected from dismissal under the first amendment); *Sweeney v. Bond*, 669 F.2d 542 (8th Cir.), cert. denied, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982).

*any particular amount, or any amount, of service.* (emphasis added). Thus, the CHA argued, and the district court agreed, that there was no deprivation of any property rights that were secured by the contract.

Triad argues, however, that regardless of the discretion given to the CHA in Article Three of the contract, the CHA's termination of the contract was a violation of certain implied rights that were secured by the contract. In support of this argument, Triad points out that Illinois law imposes upon all parties to contracts a duty of good faith in the performance of those contracts. *Rao v. Rao,* 718 F.2d 219 (7th Cir.1983). Based on this precedent, Triad argues that the CHA's politically and racially-motivated termination of the existing contract was "arbitrary and capricious" and, as such, actionable bad faith. *Foster Enterprises v. Germania Federal Savings & Loan Ass'n,* 97 Ill.App.3d 22, 30, 52 Ill.Dec. 303, 309, 421 N.E.2d 1375, 1381 (1981). In light of this argument, we believe that Triad may have been deprived of a "property interest" as that term has been defined under Illinois law.

It is a general principle of Illinois contract law that a covenant of fair dealing and good faith is implied into every contract absent express disavowal. *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 988–90, 81 Ill.Dec. 156, 169, 192, 466 N.E.2d 958, 971 (1984); *Foster,* 97 Ill.App.3d at 28, 52 Ill.Dec. at 308, 421 N.E.2d at 1380; *Martindell v. Lake Shore National Bank,* 15 Ill.2d 272, 286, 154 N.E.2d 683, 690 (1958). Under Illinois law, "[t]he concept of 'good faith' has its most natural and common application to the situation where one party

exercises discretionary authority in a manner that effects the rights and duties of the other party." *Rao,* 718 F.2d at 223; *Foster,* 97 Ill.App.3d at 29–30, 52 Ill.Dec. at 309, 421 N.E.2d at 1381. In line with this principle, Illinois courts have recognized that "[g]ood faith between contracting parties requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." *Id.; see also Dayan,* 125 Ill.App.3d at 991, 81 Ill.Dec. at 193, 466 N.E.2d at 972 (where a party acts with improper motive ... that party is exercising contractual discretion in a manner inconsistent with the reasonable expectations of the parties and therefore is acting in bad faith). Finally, this circuit has recognized that "an employee fired in breach of contract has been deprived of a legally protected interest [recognized] to be property under the Fourteenth Amendment." *Brown v. Brienen,* 722 F.2d 360, 364 (7th Cir. 1983).

In the case at bar, Triad has alleged that the CHA's termination of their 1986 contract, although facially permitted by the discretion granted the CHA by the express terms of the contract, was improperly motivated by racial and political considerations. Taking these allegations as true, as must be done in reviewing the propriety of the district court's grant of the CHA's motion to dismiss, and applying them to the legal precedent discussed above, we conclude that the CHA's actions in this case may have constituted "actionable bad faith"— i.e., a breach of the contract—and Triad may thereby have been deprived of a "property interest" under Illinois contract law.[6]

---

**6.** To clarify our position, we think it necessary to make two observations. Initially, we note that our decision in *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073 (7th Cir.1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988), is not dispositive of the issue presented today. The factual situation ruled upon by this court in *Szabo* is different from that presented today in one very important respect. In *Szabo,* the due process claim was not tied to any existing contractual right. Szabo's contractual rights had expired and they were presenting their claim only as a "disappointed bidder" for a new contract. As such,

they could not make any claim to an entitlement to a contractual duty of good faith. Triad, on the other hand, was a party to the March, 1986 contract and was effectively terminated from performing further services under that contract. This fact, we believe, distinguishes these circumstances from those presented in *Szabo* and, together with Triad's unique "duty of good faith" argument, makes this issue appropriate for full adjudication.

Second, and perhaps more significant, we think it important to point out that our decision today is necessarily limited to situations in

This determination, however, does not resolve the issue. In *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Supreme Court held that there is more to establishing a violation of the Due Process Clause of the fourteenth amendment than merely showing a deprivation of property at the hands of a person acting under the color of state law. In so holding, the Court noted, "[t]he Fourteenth Amendment protects only against deprivations 'without due process of law.'" *Id.* at 537, 101 S.Ct. at 1914. *See also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Easter House v. Felder*, 879 F.2d 1458 (7th Cir.1989) (en banc), *petition for cert. filed*, 58 U.S.L.W. 3291 (Oct. 10, 1989). The import of the Court's decision in *Parratt* was a recognition that post-deprivation remedies made available by a state can, under certain circumstances, satisfy the requirements of procedural due process. The Court opined that if this were not the case, "every alleged injury which may have been inflicted under the 'color of law' [would be converted] into a violation of the Fourteenth Amendment under § 1983." *Parratt*, 451 U.S. at 544, 101 S.Ct. at 1917.

■ Without purporting to decide the issue, we believe that the facts and issues presented in Count II of Triad's amended complaint may place it in that category of cases in which the remedies available to Triad under state contract law preclude a finding of a violation of the fourteenth amendment. As we noted in *Easter House*, "when alternative relief exists and the facts of a case dictate the application of *Parratt* and *Hudson*, a plaintiff's due process rights are not violated and no basis for a section 1983 action exists." 879 F.2d at 1476. Accordingly, we remand this issue to the district court for full consideration consistent with this opinion.[7]

### Count III: Equal Protection

In Count III of its amended complaint, Triad argued that the CHA's actions constituted a violation of their equal protection rights as guaranteed by the fourteenth amendment and § 1983. Specifically, Triad identified two companies similarly situated with Triad, Digby Security and GEJ Security, and argued that these two companies received differential treatment in a number of respects based solely on their support of political allies of the CHA and their racial identity. Relying on dicta from *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the district court concluded that corporations cannot have a "racial identity" as is required under the equal protection clause to state a claim for discriminatory purpose, and consequently, dismissed Triad's claim.

The district court's determination that corporations such as Triad cannot properly allege a "discriminatory purpose" to support a claim under the equal protection clause was premised upon the following language from *Arlington Heights*, *id.* at 263, 97 S.Ct. at 562:

which the applicable state law implies a "duty of good faith" into the contract to which the state is a party. As was noted by the Court in *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, "[p]roperty interests ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." In that Illinois state law does imply such a duty, the facts presented fall into that category of cases appropriate for "due process" adjudication. It follows, however, that our decision today does not impose due process restrictions in situations where the state law in question does not provide for an "implied duty of good faith" in the performance of contracts. *Cf. Ford Motor Credit Co. v. Garner*, 688 F.Supp.

435 (N.D.Ind.1988) (Indiana law does not imply a duty of good faith into all contracts).

7. With regard to Triad's allegation that they were denied due process by the CHA's after-the-fact alteration of the bidding requirements for a 1985 service contract, the district court concluded that Triad had failed to allege a protectible property interest. Relying on our decision in *Szabo*, the district court held that "a disappointed bidder for a contract in Illinois lacks a property interest." In that Triad's allegations with regard to this portion of their due process claim present a "disappointed bidder" argument, we agree that our decision in *Szabo* governs and affirm the district court's dismissal of this portion of Triad's Count II allegation.

As a corporation, MHDC has no racial identity and cannot be the direct target of the petitioner's alleged discrimination. The district court's conclusion, however, fails to recognize that this language from the Court's decision was nothing more than dicta. In that an individual plaintiff had standing to bring the equal protection claim in *Arlington Heights*, the Court did not resolve the issue of a corporation's standing to raise a claim of racial discrimination. *Id.* at 264, 97 S.Ct. at 562 n. 9. The lower court's determination also fails to take cognizance of post-*Arlington Heights* decisions from various circuits which, in the absence of a definitive ruling from the Supreme Court on this issue, have held that a corporation may have standing to allege racial discrimination. *J.A. Croson Co. v. City of Richmond*, 822 F.2d 1355 (4th Cir.1987), *aff'd,* — U.S. —, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (equal protection challenge to Minority Business Utilization Plan mandating a 30% set aside to minority businesses in public contracts); *Marshall v. Kleppe*, 637 F.2d 1217 (9th Cir.1980) (private cause of action alleging civil rights violation under the fifth amendment may be raised by corporation); *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702 (2d Cir.), *cert. denied*, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982) (corporation has standing to assert claims of racial discrimination under the equal protection clause); *Organization of Minority Vendors v. Illinois Central Gulf R.R.*, 579 F.Supp. 574, 589 (N.D.Ill.1983). *See generally*, Note, *Corporate Standing to Allege Race Discrimination in Civil Rights Actions*, 69 Va.L. Rev. 1153 (1983).

In that the district court dismissed Count III of Triad's amended complaint without properly considering the implications which this precedent might have on the ability of Triad to support their equal protection claim, we reverse and remand for consideration in light of this precedent.

Count IV: Section 1985(3)

■ Under 42 U.S.C. § 1985(3), a plaintiff must allege four elements to make out a valid cause of action:

(1) a conspiracy;

(2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;

(3) an act in furtherance of the conspiracy, and;

(4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States.

*United B'hood of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049 (1983); *Grimes v. Smith*, 776 F.2d 1359, 1363 (7th Cir.1985). In dismissing Triad's complaint, the district court held that Triad could not satisfy the second requirement.[8] Relying on this court's decision in *Grimes*, the district court held that the second requirement could only be satisfied by alleging a "racial, class-based animus against 'Negroes and their supporters.'" Moreover, the district court stated that, even if Triad could allege a racial identity, their claim under § 1985(3) would be dismissed because § 1985(3) does not protect "white corporations."

In Count IV of its amended complaint, Triad alleged that the CHA's actions constituted a conspiracy that deprived them of their rights not to be discriminated against on the basis of race as guaranteed by the fourteenth amendment and to free association as guaranteed by the first amendment. Thus, the import of Triad's allegation was that they were the victims not only of a racially-motivated conspiracy, but also one that was politically-motivated. Triad argues that these allegations are recognized as being within the potential scope of § 1985(3) by this court's decisions in *Grimes* and *Volk v. Coler*, 845 F.2d 1422 (7th Cir.1988). We agree and remand to the district court for further proceedings.

---

**8.** In that the district court limited its ruling to this aspect of the § 1985(3) claim, we will limit our consideration in like manner.

In *Grimes,* this court held that an allegation of a "wholly nonracial, but politically motivated" conspiracy was not cognizable under § 1985(3). In so holding, however, we expressly noted that conspiracies animated by *both* racial and political motives were still within the scope of § 1985(3)'s coverage. 776 F.2d at 1366 n. 12; *see also Quinones v. Szorc,* 771 F.2d 289, 291–92 (7th Cir.1985). In its amended complaint, Triad has alleged a conspiracy motivated by both political and racial animus. Thus, on its surface, Triad's complaint appears to fall within that class of cases cognizable under § 1985(3). Triad's allegation is unique, however, in that its "racial animus" component asks this court to recognize a claim under § 1985(3) which has not been affirmatively ruled upon by any court to date. Specifically, Triad's claim raises the question of whether the coverage of § 1985(3)'s remedial scheme can be extended to encompass alleged conspiracies against whites. We believe that it can.

The parameters of the remedial provisions of § 1985(3) have been addressed in a variety of circumstances. *See generally, Scott,* 463 U.S. 825, 836–37, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983) (Court refused to extend coverage of § 1985(3) to conspiracies motivated by economic or commercial animus); *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (While holding that § 1985(3) covered private conspiracies, Court reserved comment on question of § 1985(3)'s applicabiity to non-racial classes); *D'Amato v. Wisconsin Gas Co.,* 760 F.2d 1474 (7th Cir.1985) (Handicapped persons are not included in coverage of § 1985(3)); *Grimes v. Smith,* 776 F.2d 1359, 1365–66 (7th Cir.1985) (Court declined to extend the coverage of § 1985(3) to purely nonracial, politically-motivated conspiracies); *Volk v. Coler,* 845 F.2d 1422 (7th Cir.1988) (Coverage of § 1985(3) extends to encompass purely politically-motivated conspiracies). In *Scott,* the Court stated, "it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus

against Negroes and those who championed their cause, most notably Republicans." 463 U.S. at 836, 103 S.Ct. at 3360. Although not dispositive of the issue presented to this court in *Grimes,* this court briefly alluded to the parameters of § 1985(3)'s coverage. 776 F.2d at 765–66. In neither of these cases, however, was the issue affirmatively addressed and resolved. Thus, while we are addressing a previously undecided area of law, we are by no means writing on a clean slate.

Section 1985(3) provides, in pertinent part:

> If two or more persons ... conspire or go in disguise on the highway ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws ... the party so injured or deprived may have an action for the recovery of damages....

In evaluating the viability of various claims under this language, the Supreme Court has required that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798. The Court has gone further in this context to state, "[t]he conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Id. See also Scott,* 463 U.S. at 835, 103 S.Ct. at 3359. Thus, our task is to determine whether a conspiracy allegedly aimed against whites is "racial" within the context of § 1985(3) as that provision has been interpreted by the Supreme Court.

Section 1985(3) was originally enacted as part of § 2 of the "Ku Klux Klan Act of 1871." [9] In light of this fact, it cannot be doubted that the predominant purpose of the legislature in passing this Act was to combat the prevalent animus against Blacks and their supporters in the South during the Reconstruction Era. *See generally Scott,* 463 U.S. at 836–38, 103 S.Ct. at 3360–61; *Grimes,* 776 F.2d at 1363–66. In

---

**9.** The Act was originally known as "An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes." Act of April 20, 1871, ch. 22, 17 Stat. 13.

holding as we do today, however, we go beyond this "predominant purpose."

In his dissent in *Scott*, Justice Blackmun stated, "[d]etermining the scope of § 1985(3) is a matter of statutory construction and has nothing to do with current interpretations of the First or Fourteenth Amendments." 463 U.S. at 841, 103 S.Ct. at 3362 n. 3. While we agree with his conclusion, we respectfully suggest that determinations as to the scope of § 1985(3) should not be made in a vacuum independent of considerations surrounding current fourteenth amendment jurisprudence. In conformity with this philosophy, we begin by focusing on the statutory language of § 1985(3).

In the enumeration of those persons encompassed within its protection, § 1985(3) expressly states "any person or class of persons...." As was pointed out by Justice Stewart in *Griffin*, "[t]he approach of this Court to other Reconstruction civil rights statutes ... has been to 'accord [them] a sweep as broad as [their] language.'" 403 U.S. at 97, 91 S.Ct. at 1796 (citing *United States v. Price*, 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)). Under this rationale, § 1985(3)'s protection would clearly extend to white persons and whites as a class of persons. This conclusion is at least tangentially supported by recent interpretations of the language of § 1985(3) by the Supreme Court. In *Scott*, the Court stated, "[t]he language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." 463 U.S. at 835, 103 S.Ct. at 3359 (quoting *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798) (emphasis in original). While the Court has never held that this language was meant to encompass more than animus directed against blacks, this is a logical interpretation of the Court's language. Indeed, an expansion of the protection granted by this language to groups other than blacks has already been undertaken by this court.

In *Quinones*, this court held that the remedial provisions of § 1985(3) extended to cover allegations of a "racially and politically motivated conspiracy" as advanced by an Hispanic. Clearly, discrimination against an Hispanic was no more in the mind of Congress in 1871 than was discrimination against whites. This fact, however, did not limit the extent to which we were willing to apply the remedial provisions of § 1985(3) in an attempt to end all forms of racial discrimination. In like manner, the fact that discrimination against whites was not the primary concern of the 42d Congress in 1871 should not deprive whites from receiving the protections of § 1985(3) expressly granted to "any person or class of persons." Thus, we conclude, based on the statutory language of § 1985(3) and the interpretations given to that language by both the Supreme Court and this court, that allegations of a conspiracy motivated by a racial animus against whites are cognizable under § 1985(3).

As a final matter, we note that our construction of § 1985(3), although not governed by fourteenth amendment jurisprudence, is also not rendered in a vacuum completely independent of its teachings. One cannot read these two provisions without noticing the similarities in their texts. *See Griffin*, 403 U.S. at 97–98, 91 S.Ct. at 1795; *Scott*, 463 U.S. at 832, 103 S.Ct. at 3358. In an attempt to provide continuity in the guarantee of "equal protection of the laws" as it is provided for by the Constitution and by this Act of Congress, we look to fourteenth amendment jurisprudence as a guide to our decision today.

In *City of Richmond v. J.A. Croson Co.*, — U.S. —, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), the Court affirmed the decision of the Fourth Circuit holding that the City of Richmond's minority set-aside program was unconstitutional under the fourteenth amendment. In a portion of the opinion representing a plurality of four justices, Justice O'Connor reiterated the view expressed by Justice Powell in *University of California Regents v. Bakke* stating, "'[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.'" *Croson*, — U.S. at —, 109 S.Ct. at 721 (quoting *Bakke*, 438 U.S. at 289–90, 98 S.Ct. at 2748). This fundamental principle of fourteenth amendment jurisprudence is instructive in our decision today. Though we are not bound by its precedent in our interpretation of § 1985(3), we are persuaded by its logic.

For the foregoing reasons, we conclude that the remedial provisions of § 1985(3) do cover conspiracies motivated by a racial animus towards whites and remand this issue to the district court for consideration in light of this opinion.

Count V: Civil RICO

■ In Count V of its amended complaint, Triad alleged that the activities of the CHA during the period between January, 1985, and April, 1987, constituted a pattern of racketeering activity in violation of §§ 1962(c) and 1962(d) of the civil RICO statute. Specifically, Triad alleged that the defendants committed acts of mail and wire fraud by falsely inducing Triad to bid for and provide security services when the CHA did not in fact intend to award Triad the service contracts or evaluate and rate Triad's performance according to their proposals and experience. The district court dismissed Triad's RICO claim ruling that Triad did not have standing to assert such a claim in that they could not allege an injury to their business or property which was proximately caused by the CHA's alleged racketeering activity. 18 U.S.C. § 1964(c). We affirm the district court's dismissal of Triad's civil RICO claim. Our affirmance, however, is premised upon grounds different from those relied upon below.

The district court's dismissal of Triad's RICO claim was based primarily on the conclusion that the contract in question between the CHA and Triad—i.e. the March, 1986 contract—reserved to the CHA the right to do all of the acts complained of by Triad as allegedly causing the injury suffered. Relying on *Robinson v. City of Chicago,* 656 F.Supp. 555 (N.D.Ill.1987), the district court concluded that a disappointed bidder such as Triad could not allege an injury sufficient to support a civil RICO action. In light of our earlier conclusion that the CHA had an obligation under Illinois law to exercise its contractual discretion in "good faith" and that this obligation may have been breached under these facts, we are reluctant to conclude that Triad has not alleged a sufficient injury under the civil RICO statute. We need not address that issue, however, in that we conclude that Triad's RICO claim fails for a separate fundamental reason to state a claim upon which relief can be granted. Specifically, we find merit in the CHA's argument that Triad's claim fails to allege a "sufficient pattern of racketeering activity" under this court's civil RICO precedent.

Triad's claim in Count V is brought pursuant to 18 U.S.C. §§ 1962(c) and (d). These provisions provide, in pertinent part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

As we noted in *Elliott v. Chicago Motor Club Ins.,* 809 F.2d 347, 349 (7th Cir.1986), "[a] crucial element of a section 1962 claim ... is the existence of a pattern of racketeering activity." Ever since the Supreme Court narrowed its interpretation of the "pattern" requirement in *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), this court has struggled to determine exactly what constitutes a "pattern of racketeering activity" sufficient to support a § 1962 claim. *See generally Jones v. Lampe,* 845 F.2d 755, 756 & n. 4 (7th Cir.1988) (list of cases dealing precisely with this issue). The guidelines which have precipitated from these decisions for courts to consider in evaluating the sufficiency of a § 1962 claim, however, militate against a conclusion that Triad's claim satisfies the pleading requirements of § 1962.

In *Sedima,* the Court noted in discussing the definition of a "pattern of racketeering activity" that, "[t]he infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285 n. 14. Focusing on the "continuity plus relationship" requirement espoused by the Supreme Court, this court has stated that a determination as to whether a "pattern of racketeering activity" exists in any given situation is a fact-specific question hinging on a variety of relevant factors. *Jones,* 845 F.2d at 757. Specifically, we have held that four factors should be considered in making this determination. These factors are: (1) the number and variety of the predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and, (4) the occurrence of distinct injuries. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1304 (7th Cir.1987) (citing *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986)). Finally, in *Lipin Enterprises, Inc. v. Lee,* 803 F.2d 322, 324 (7th Cir.1986), we held that a sin-

gle fraudulent scheme with only one injury to one victim was not a "pattern of racketeering activity" under § 1962(c) simply because it required several acts of mail and wire fraud to inflict the single injury. In so holding, we stated:

> Mail fraud and wire fraud are perhaps unique among the various sorts of 'racketeering activity' possible under RICO in that the existence of a multiplicity of predicate acts ... may be no indication of the requisite continuity of the underlying fraudulent activity. Thus, a multiplicity of mailings does not necessarily translate into a 'pattern' of racketeering activity.

*Lipin*, 803 F.2d at 325; *see also Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278–79 (7th Cir.1989); *Tellis v. United States Fidelity & Guar. Co.*, 826 F.2d 477, 478 (7th Cir.1986) (multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern). It is under this precedent that Triad's present RICO allegation fails.

Triad alleges that the CHA and the individually-named defendants have "repeatedly used the United States mail and interstate telephone wires in furtherance of a scheme to defraud plaintiffs out of money...." Triad points specifically to six "predicate acts" of mail fraud. Two were in the form of "Requests for Proposals" for guard services on January 11, 1985, and April 23, 1985. One was a letter sent from defendant Allen to Triad on March 14, 1986, giving Triad "a three day deadline ... to execute the altered protective service contract." Three instances of the alleged mail fraud surrounded the termination of Triad from its performance of services under a portion of the 1986 contract. First, Triad points to a letter dated August 22, 1986, notifying Triad to terminate their services at certain family housing locations. Second, Triad points to a letter dated September 10, 1986, threatening Triad with termination of the contract unless they produced proof of a properly executed bond and proof of insurance by September 18, 1986. Finally, Triad points to a letter dated December 1, 1986, wherein the CHA notified plaintiffs that their "security personnel be pulled from CHA's Central Office." Likewise, Triad points specifically to five "predicate acts" of wire fraud. The first such act was a phone call on February 26, 1986, by which defendant Allen "fraudulently represented that GEJ

and Digby had executed and were in full compliance with the CHA protective service contract requirements." Second, Triad points to three calls, on February 16th, 20th, and 23rd, whereby CHA made "numerous false assurances ... that past due invoices ... would be paid...." Finally, Triad points to a call on April 27, 1987, whereby the CHA contacted plaintiffs and instructed them to reduce the daily number of guards providing security throughout family housing.

These allegations comprise the heart of Triad's civil RICO claim. As in *Jones*, however, these allegations do not allege a "pattern of racketeering activity" sufficient to support a § 1962(c) claim. Triad alleges only one general scheme—i.e., that of ousting Triad from the provision of security services and replacing them with GEJ and Digby. All of this alleged activity surrounds two transactions, only one of which actually came to fruition—i.e., the March, 1986 contract between Triad and the CHA. Triad alleges only one victim—i.e., themselves. Finally, Triad alleges only one type of injury—i.e., their failure to secure and retain all of the business to which they claim an entitlement under the 1986 contract. These allegations, though by no means condoned in a general sense, do not support a "pattern of racketeering activity" sufficient to support a federal RICO case. *See Jones*, 845 F.2d 755 (7th Cir. 1988); *Medical Emergency Serv. Assocs. v. Foulke*, 844 F.2d 391 (7th Cir.1988).

For the foregoing reasons, we affirm the district court's dismissal of Count V of Triad's amended complaint.

Attorney's Fees

Upon motion by the CHA, the district court below granted attorney's fees and sanctions under 42 U.S.C. § 1988 and Rule 11 on Counts II and IV of Triad's amended complaint. Specifically, the district court found that Counts II and IV were "frivolous and not warranted by the law" in violation of both § 1988 and Rule 11. Moreover, the district court concluded that Triad and its attorneys violated Rule 11 by failing to conduct an independent investigation into the factual allegations contained in Paragraphs 15(d) and (e) of the amended complaint. We affirm in part and reverse and remand in part.

■ Initially, we address the propriety of the district court's award of attorney's fees under § 1988. The very text of

§ 1988 states that "the court, in its discretion, may allow *the prevailing party ...* reasonable attorney's fee as part of the costs." *See Szabo*, 823 F.2d at 1076. By virtue of our rulings with regard to Counts II and IV, the CHA is no longer a "prevailing party." As such, any amount awarded to the CHA as attorney's fees under § 1988 has been rendered improper by our decision. Accordingly, we reverse the award of those amounts.

■ With regard to the award of sanctions under Rule 11, our recent decision in *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928 (7th Cir.1989) (en banc), establishes that the appropriate standard of review is "abuse of discretion." The district court's award of sanctions under Rule 11 was premised on two distinct findings. First, the district court concluded that Counts II and IV were "frivolous and not warranted by the law." The fact that we have remanded Counts II and IV to the district court for further proceedings, however, is strong indication that we do not consider these claims "frivolous and not warranted by the law." On the contrary, we find that in each instance Triad has made a "good faith argument for the extension ... of existing law." As such, we conclude that the district court's award of Rule 11 sanctions based on this first premise was an "abuse of discretion." Accordingly, we reverse.

■ Second, the district court found that Triad and its attorneys failed to conduct an independent investigation of the factual allegations in Paragraphs 15(d) and (e) of its complaint and awarded sanctions on those grounds. With regard to this aspect of the district court's award of sanctions, we affirm. As was noted in *Mars Steel*, Rule 11 "is not a fee-shifting statute in the sense that the loser pays. It is a law imposing sanctions if counsel files with improper motives or inadequate investigation." 880 F.2d at 932. The district court

10. In ruling upon this motion for sanctions, the district court apparently relied upon the affidavits of Robert Whitfield and Wilbert Allen which directly contradict Triad's assertions in Paragraphs 15(d) and (e). These affidavits, submitted as part of the Appendix to the CHA's "Memorandum in Support of Defendant's Motion to Dismiss," are beyond the scope of the pleadings to which the district court is confined in ruling upon the CHA's motion to dismiss. This fact, however, does not render them inappropriate for consideration in ruling upon the CHA's motion for Rule 11 sanctions. As we

below concluded, on the basis of unrebutted evidence, that Triad's allegations in Paragraphs 15(d) and (e) were advanced without the benefit of adequate factual investigation.[10] We decline to find such a factual determination an "abuse of discretion" and, accordingly, we affirm this aspect of the district court's award of Rule 11 sanctions.

### III. CONCLUSION

With regard to the substantive issues in Counts I through V of Triad's Amended Complaint, we affirm in part and reverse in part. Initially, we affirm the dismissal of Counts I and V. With respect to Counts II, III and IV, however, we reverse and remand for consideration consistent with this opinion.

In like manner, the district court's award of attorney's fees and sanctions under § 1988 and Rule 11 is affirmed in part and reversed and remanded in part. We reverse the district court's award of attorney's fees under § 1988 on Counts II and IV. With regard to the district court's award of sanctions under Rule 11, we reverse that portion of the award of sanctions attributable to the determination that Counts II and IV were "frivolous and not warranted by the law." That portion of the award of sanctions attributable to the "inadequate factual investigation" prong of Rule 11 is affirmed. Finally, we remand these sanctions determinations to the district court for apportionment consistent with this opinion.

### ORDER

In its published opinion in this matter the court did not address the "MOTION TO DISMISS APPEAL NO. 88–2830 INSOFAR AS IT SEEKS TO APPEAL THE SANCTIONS ORDER ENTERED AGAINST ATTORNEY JOHN GUBBINS" filed by the Chicago Housing Authority, defendants, in this court on December 14, 1988. We take this opportunity to address that motion.

stated in *Szabo*, "[t]he violation of Rule 11 is complete when the paper is filed." 823 F.2d at 1077. With this fact in mind, it matters not whether the plaintiff's claim is subsequently disposed of on the merits, on a voluntary dismissal, or upon a motion to dismiss. The fact remains that Rule 11 has been violated and the plaintiff must expect to pay. *Cf. Id.* at 1077–79. As such, we conclude that the district court's consideration of these materials outside of the pleadings was not improper for the purposes of ruling on the CHA's motion for sanctions.

The district judge found that the plaintiffs and their attorneys violated Rule 11 with regard to Counts II and IV of the complaint. As a result sanctions were imposed, and plaintiffs and their attorneys were jointly ordered to pay attorneys fees and expenses of the defendants related to those allegations.

The Notice of Appeal of the district court's order imposing sanctions, dated September 19, 1988, reads in pertinent part:

> Plaintiffs-appellants, *Triad Associates, Inc., d/b/a Guardian Security, JK Guardian Security Services, Inc., and K & J Management, Inc.,* appeal the orders of the district court entered in this case June 15, 1988 and August 17, 1988 imposing sanctions jointly and severally against plaintiffs-appellants and their attorneys (emphasis added).

It is obvious from the emphasized portion of the foregoing language that neither Mr. Gubbins, nor any of plaintiffs attorneys, were included in the notice of appeal.

Federal Rule of Appellate Procedure 3(c) requires that "the notice of appeal shall specify the party or parties taking the appeal...." As we stated in *Rogers v. National Union Fire Ins. Co.,* 864 F.2d 557 (7th Cir.1988), "Rule 3(c)'s naming requirement is jurisdictional and inflexible. *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988)...." We went on to say in *Rogers* that "when a district court sanctions attorneys the attorneys are the real parties in interest, and the attorneys must appeal in their own names. A notice of appeal naming the party ... as the appellant, not the attorneys, does not create jurisdiction over the attorneys' appeal."

It is, in fact, not clear that plaintiffs' attorneys intended to appeal the sanctions imposed against them. Mr. Gubbins did not respond to the defendants' motion to dismiss and the sanctions liability of plaintiffs' attorneys was not addressed in the briefs. Nevertheless, whether Mr. Gubbins or plaintiffs' attorneys intended to appeal is academic. We are without jurisdiction over the issue of sanctions entered against plaintiffs' attorneys relating to Counts II and IV of the complaint.

Accordingly, it is ORDERED that the motion of the CHA defendants to dismiss the district court's sanctions order, insofar as that order ran against Attorney John Gubbins, is GRANTED.

Furthermore, on consideration of the petition for rehearing and suggestions for rehearing *en banc* filed in the above-entitled cause by the attorney for defendants/appellees, no judge in active service has requested a vote thereon, and all of the judges on the original panel have voted to deny the petition for rehearing and suggestions for rehearing *en banc*. Accordingly,

IT IS HEREBY ORDERED that the aforesaid petition for rehearing and suggestions for rehearing *en banc* be, and the same are hereby, DENIED.